LENAWEE COUNTY v WAGLEY

Docket No. 311255. Submitted April 2, 2013, at Detroit. Decided May 21, 2013, at 9:10 a.m. Leave to appeal sought.

Lenawee County initiated a project to expand and modify the Lenawee County Airport, including the lengthening of a runway, and ultimately brought separate condemnation actions in the Lenawee Circuit Court under the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.*, against five parcels of property, including the residence owned by David and Barbara Wagley in which Bank of Lenawee and Pavillion Mortgage also had an interest. Federal Aviation Authority (FAA) standards require a runway protection zone (RPZ), and because the properties were in the RPZ, the county sought an avigation easement to permit unimpeded flight over the properties. The easement prohibited certain structures, obstructions, and activities on the properties. Two interlocutory appeals ensued. In the first, the county challenged the court's summary ruling that FAA regulations precluded residential uses within RPZs, resulting in a total taking of the properties as a matter of law. The Court of Appeals, SAWYER, P.J., and FITZGERALD and DONOFRIO, JJ., reversed in an unpublished opinion per curiam, issued March 22, 2007 (Docket Nos. 268819, 268820, 268821, 268822, and 268823) (*Wagley I*), holding that an avigation easement approved by the FAA is an acceptable alternative to complete acquisition of the property and that information submitted by the county demonstrated that the FAA had approved the easement. The trial court had erred by determining that a total taking was required under FAA regulations as a matter of law, but the Court of Appeals held that a condemning agency is required to pay just compensation for the whole parcel of property if acquiring only a portion of it would destroy the practical value or utility of the remainder and reserved for the jury's determination whether the defendants had suffered a total taking. Following discovery, the parties stipulated that no party would elicit testimony from the FAA. The parties then disagreed about the role FAA publications would play at trial, leading to the second interlocutory appeal. On appeal, the county objected to the exclusion of four evidentiary items and contended that the trial court should have excluded an appraisal that was predi-

cated on the assumption that location of the properties in the RPZ prohibited residential use. The Court of Appeals, MURPHY, C.J., and JANSEN and OWENS, JJ., held in an unpublished opinion per curiam, issued December 20, 2011 (Docket Nos. 302533, 302534, 302535, 302537, and 302538) (*Wagley II*), that under the law of the case doctrine, it would be improper to allow the jury to hear testimony regarding an appraisal that was predicated on purported FAA regulations prohibiting residency in an RPZ and that the trial court had erred by denying the county's motion to exclude that portion of the appraisal. The Court of Appeals also held that the parties' stipulation precluding any party from eliciting testimony from the FAA governed the remaining evidentiary issues and affirmed the trial court's rulings on those issues. At the trial that followed, the FAA was referred to numerous times. With respect to the Wagleys, the jury found that the county's acquisition of the easement destroyed the practical value or the utility of the Wagleys' property and determined just compensation as $470,000. The trial court, William E. Collette, J., sitting by assignment, entered a judgment accordingly, including statutory interest under MCL 213.65 of the UCPA and an additional $117,500 under MCL 213.23. The county appealed that judgment.

The Court of Appeals *held*:

1. Under the law of the case doctrine, a ruling by an appellate court on a particular issue binds that court and all lower tribunals with respect to the issue. If an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions the appellate court determined will not be determined differently on a subsequent appeal in the same case when the facts remain materially the same. The doctrine applies only to issues actually decided, either implicitly or explicitly, in the prior appeal. *Wagley I* and *II* barred (1) evidence predicated on an assumption that FAA regulations required a total taking or precluded homes in the RPZ and (2) evidence contravening the parties' stipulation excluding testimony from the FAA. They did not bar all references to the FAA or exclude the admission or use of FAA regulations. It would have been impractical to have tried this case without referring to any of the regulations, recommendations, circulars, and statements governing runways and RPZs. *Wagley I* prohibited the Wagleys from asserting a legally incorrect argument (that the FAA mandated a total taking of their property) but did not address evidence regarding the practicability of removing homes or the dangers attendant to home occupancy in an RPZ. Whether the

practical value or the utility of the remainder of the property was in fact destroyed was a question to be determined by the finder of fact and included in the verdict.

2. The trial court did not err by denying the county's request that the court take judicial notice that the FAA did in fact approve the easements, letting the houses remain. That the FAA had approved the easement was squarely before the jury from the outset. The evidence presented by both sides presumed that the FAA had approved the entire project, including the avigation easement.

3. The county asserted that the trial court incorrectly permitted the Wagleys to structure their total-taking claim around their residence's presence in the RPZ rather than the diminution of value resulting from the avigation easement and that the trial court incorrectly ruled that the taking occurred when the Wagleys' property was placed in the RPZ. The trial court did not err by permitting the jury to award damages for placement of the home in the RPZ. The jury instructions left no room for doubt that the jury's task was to determine whether the practical value of the remainder of the property was destroyed or diminished in value, and the jury verdict form reiterated that the easement rather than the RPZ governed the jury's decision.

4. The county argued that because it lacked any responsibility for the dimensions of the RPZ (attributing that duty to the FAA alone), the evidentiary references to the RPZ called into question the propriety of state court jurisdiction. The county initiated this action in the state circuit court under the auspices of state law, however, and did not seek removal of the action to federal court. A party is bound by its pleadings, and it is not permissible to litigate issues or claims that were not raised in the complaint. Because the county initiated this action in the state circuit court and sought a determination of just compensation, it could not later imply that it was not a proper party on which to impose damages.

5. The trial court erred by permitting two defense expert witnesses to opine regarding when a taking occurs. The opinion of an expert may not extend to the creation of new legal definitions and standards or to legal conclusions. Moreover, an expert witness may not testify regarding a question of law because it is the exclusive responsibility of the trial court to find and interpret the law. Despite the admission of this improper testimony, however, the county could not demonstrate that the error resulted in undue prejudice or affected the outcome of the jury's verdict. Ultimately, the parties agreed about the date on which the property was to be valued. Testimony by the experts about when the taking was

effectuated was completely irrelevant to this determination. Furthermore, the trial court's jury instructions were proper, and jurors are presumed to follow their instructions.

6. The county argued that the trial court erred by permitting a defense expert witness to testify regarding the effect of the airport and easement on the marketability of the Wagleys' property and the disclosures required in real estate transactions without first conducting a hearing in accordance with *Daubert v Merrell Dow Pharm, Inc*, 509 US 579 (1993). The purpose of a *Daubert* hearing is to filter out unreliable expert evidence. MRE 702 requires trial courts to act as gatekeepers and exclude that testimony. While *Daubert* hearings are required when dealing with expert scientific opinions in an effort to ensure the reliability of the foundation for the opinion, when expert testimony on nonscientific matters is involved, the *Daubert* factors may be pertinent or the relevant reliability concerns may focus on personal knowledge or experience. The gatekeeping inquiry is context-specific and must be tied to the factors of a particular case. The expert did not offer scientific expert testimony; rather, his testimony constituted other specialized knowledge under MRE 702, and in that context the factors enumerated in *Daubert* could not readily be applied to measure the testimony's reliability. The expert sufficiently explained how his experience led to his opinions, and he acknowledged that his testimony constituted opinion based on his experience. The trial court did not err by refusing to conduct a *Daubert* hearing.

7. The trial court did not err by permitting a defense witness to testify that the easement permitted pilots to fly three feet above the Wagleys' roof. That testimony was premised, in part, on the county's answer to interrogatories. The county initiated the discussion of heights through its questioning of its own witnesses. The respective expert witnesses offered conflicting opinions and interpretations regarding the effect of the easement. Disagreements pertaining to an expert witness's interpretation of the facts are relevant to the weight of that testimony, not its admissibility.

8. MCL 213.65 provides for the computation of interest on a just compensation award from the date of the filing of the complaint to the date that payment is tendered. An owner remaining in possession after the date that the complaint is filed, however, waives the interest for the period of the possession. Defense counsel requested that interest be computed from November 21, 2007, the date that the trial court entered an order allowing the county to take possession of the easement. The county argued that the Wagleys were only entitled to statutory

interest from the date on which the county took possession of the entire property and that because the Wagleys retained possession of the property, regardless of whether they used it, and lost only the right to use the airspace beyond a certain height, they were not entitled to interest. The legislative intent behind the UCPA is to place property owners in as good a position as they were before the taking. In general, interest on condemnation awards begins to accumulate on the date of judgment. When there has been a taking of property during the pendency of the proceedings, however, interest is allowed from the date of taking but does not begin to run until the condemnor has possession of the property. The county's taking of the avigation easement did not permanently deprive the Wagleys of the entirety of their property, but the trial court's November 21, 2007, order did immediately and permanently deprive the Wagleys of any possession or use the property actually taken, i.e., the airspace above the parcel. The Wagleys' right to interest under the statute began to run as of their loss of use and right to possess the airspace on that date.

9. The trial court's order provided that if the county elected to take title to the property, it had to pay the Wagleys an additional $117,500 pursuant to MCL 213.23. When the county filed its complaint to condemn the Wagleys' property, MCL 213.23 authorized the taking. The Legislature subsequently amended MCL 213.23 to add subsection (5), which provides that if the property taken consists of an individual's principal residence, the amount of compensation must be no less than 125 percent of the property's fair market value. Statutes are presumed to operate prospectively unless the contrary intent is clearly manifested, particularly if retroactive application would impair vested rights, create a new obligation and impose a new duty, or attach a disability with respect to past transactions. An exception to the general rule exists if a statute is remedial or procedural in nature. A statute is remedial when it corrects an existing oversight in the law, redresses an existing grievance, introduces regulations conducive to the public good, or intends to reform or extend existing rights. MCL 213.23(5) created a new right. It also imposed a converse duty on the condemning agency to remit an enhanced award. The potential for damages arose when the county filed this condemnation action, not when the taking was actually allowed. The trial court's order enhancing the damages award must be reversed.

Affirmed in part, reversed in part, and remanded.

K. F. KELLY, J., concurring in part and dissenting in part, agreed fully with the majority's analysis but concluded that the Wagleys remained in possession of the property and therefore waived any

statutory interest. Under MCL 213.57, title to the property automatically vested in the county as of the date it filed the condemnation complaint. The trial court, however, had to take action for possession of the property to pass to the county. MCL 213.59 provides that the court must fix the time and terms for surrender of possession of the property to the condemning agency. The county possessed the rights acquired through the avigation easement since November 21, 2007. While imposition of the easement interfered with the Wagleys' use and enjoyment of the property, it did not permanently deprive them of any possession or use of their residence. Although the jury determined that the easement destroyed the practical value or utility of the remainder of the property, that is not the equivalent of a deprivation of possession and use during the proceedings. Accordingly, Judge KELLY would have reversed that portion of the trial court's order awarding interest under MCL 213.65.

1. WITNESSES — EXPERT WITNESSES — LEGAL MATTERS.

> The opinion of an expert witness may not extend to the creation of new legal definitions and standards or to legal conclusions, nor may an expert witness testify regarding a question of law because it is the exclusive responsibility of the trial court to find and interpret the law.

2. WITNESSES — EXPERT WITNESSES — TESTIMONY ON NONSCIENTIFIC MATTERS — *DAUBERT* HEARINGS.

> The purpose of a hearing under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579 (1993), is to filter out unreliable expert evidence, and MRE 702 requires trial courts to act as gatekeepers and exclude that testimony; while *Daubert* hearings are required when dealing with expert scientific opinions in an effort to ensure the reliability of the foundation for the opinion, when expert testimony on nonscientific matters is involved, the *Daubert* factors may be pertinent or the relevant reliability concerns may focus on personal knowledge or experience; the gatekeeping inquiry is context-specific and must be tied to the factors of a particular case; in the context of an expert witness whose testimony constitutes other specialized knowledge rather than scientific expert testimony, the factors enumerated in *Daubert* cannot readily be applied to measure the testimony's reliability.

3. EMINENT DOMAIN — JUST COMPENSATION — AIRSPACE — AVIGATION EASEMENTS — INTEREST ON AWARD.

> MCL 213.65 provides for the computation of interest on a just compensation award in a condemnation case from the date the

complaint is filed to the date that payment is tendered; an owner remaining in possession after the date that the complaint is filed, however, waives the interest for the period of the possession; an order establishing an avigation easement, which prohibits certain structures, obstructions, and activities on a property to permit unimpeded flight over it, does not permanently deprive the owner of the entirety of the property, but does immediately and permanently deprive the owner of any possession or use the property actually taken (the airspace above the property), and the right to interest under the statute begins to run as of the date of that order.

*Strauss & Strauss, PLLC* (by *Gary David Strauss*), for Lenawee County.

*Clark Hill PLC* (by *Stephon B. Bagne*) and *Whitker & Benz, P.C.* (by *Bruce H. Benz*), for David and Barbara Wagley.

Before: BORRELLO, P.J., and K. F. KELLY and GLEICHER, JJ.

GLEICHER, J. In this condemnation dispute, a jury awarded defendants, David Wagley, Barbara Wagley, Bank of Lenawee, and Pavillion Mortgage, $470,000 as just compensation for an avigation easement over the Wagleys' residential property, plus interest, costs, and fees.[1] Plaintiff, Lenawee County, appeals as of right, raising numerous challenges to evidentiary rulings, the jury instructions, and the trial court's posttrial supplementary damages award. We affirm the trial court's evidentiary and instructional rulings. We also affirm the court's award of statutory interest on the just

---

[1] "Avigation" refers to "aerial navigation." *The Random House Dictionary of the English Language, Second Edition Unabridged* (1987). An avigation easement permits unimpeded aircraft flights over the servient estate. *Lenawee Co v Wagley*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2011 (Docket Nos. 302533, 302534, 302535, 302537, and 302538), p 3 n 1, quoting Black's Law Dictionary (7th ed), p 527.

compensation award. We reverse, however, the trial court's order enhancing the damages award in the event the county decides to take the entirety of the Wagleys' property because this would require retroactive application of a statute creating substantive rights. We remand for correction of the judgment accordingly.

### I. UNDERLYING FACTS AND PROCEEDINGS

This case arises from the county's decision to expand and modify the Lenawee County Airport. The project began in approximately 1994 and evolved over several years. The 2003 revisions increased the length of Runway 23 from 4,000 to 5,000 feet and shifted the runway's location. The additional length permitted larger corporate aircraft to regularly operate at the airport and generally enhanced aviation safety.

David and Barbara Wagley own a four-bedroom home on a 1.3-acre lot abutting the airport. Bank of Lenawee and Pavillion Mortgage each have an interest in the property as well.[2] The Wagleys purchased the home in 2001, before Runway 23 was lengthened. The new runway is actually 532 feet farther from the Wagleys' property than the prior runway. But due to the runway lengthening, a larger area on the ground and in the air must remain free of obstructions.

Federal Aviation Authority (FAA) standards mandate the creation of a runway protection zone (RPZ) "begin-[ning] 200 feet beyond the end of the area useable for takeoff or landing," maintained to "enhance the protection of people and property on the ground."[3] Pursuant

---

[2] For ease of reference, we will refer to the collective defendants simply as "the Wagleys."

[3] FAA Policy and Procedures Memorandum, Airports Division, No. 5300.1B, issued February 5, 1999, ¶¶ 2(j) and 3(b).

to the 2003 airport layout plan, the FAA determined that the Wagleys' home was within the RPZ. Although the parties disputed whether the home had always been within the RPZ, the county did not seek an avigation easement until 2005, when it filed this condemnation action under the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.* With its complaint, the county filed a declaration of taking estimating the just compensation due the Wagleys as $47,500.

The avigation easement described in the declaration of taking permits the county "to keep the airspace above [certain] heights . . . clear and free" of obstructions including fences, trees, and buildings. The easement also governs activities on the land, prohibiting "any ground structures, natural growth, storage of equipment, vehicles or aircraft, flammable material storage facilities, or activities which encourage the congregation of people in the [RPZ] . . . ." Attendant to the easement, the county prohibited the creation of "electrical interference with radio communication between" the airport and aircraft and activities "mak[ing] it difficult for fliers to distinguish between airport lights and others" or resulting in glare in fliers' eyes or "otherwise . . . endanger[ing] the landing, taking-off or maneuvering of aircraft[.]" Further, the easement forecloses on the encumbered land "the construction of new residences . . . or places of public assembly, such as churches, schools, office buildings, shopping centers, and stadiums."

Two interlocutory appeals brought the parties to this Court before trial commenced. In the first, the county challenged the trial court's summary ruling that FAA regulations precluded residential uses within RPZs, resulting in a total taking of the Wagleys' property as a matter of law. This Court reversed, holding that an

avigation easement approved by the FAA is an "acceptable alternative" to complete acquisition of the property. *Lenawee Co v Wagley*, unpublished opinion per curiam of the Court of Appeals, issued March 22, 2007 (Docket Nos. 268819, 268820, 268821, 268822, and 268823) (*Wagley I*), p 5. Documentary information submitted by the county satisfied this Court that the FAA had approved the avigation easement. *Id.* at 6. Thus, "the trial court erred in determining that a total taking was required under FAA regulations 'as a matter of law.'" *Id.* Nevertheless, this Court observed that "[a] condemning agency is required to pay just compensation for the whole parcel of property if acquiring only a portion of it would destroy the practical value or utility of the remainder." *Id.* at 7, citing MCL 213.54(1) and M Civ JI 90.18. We specifically reserved for a jury's determination whether the Wagleys "suffered a total taking — that is, whether the practical value or utility of the remainder of the parcels was destroyed — is a disputed question of fact . . . ." *Id.* at 8.

Extensive discovery ensued. In October 2008, the parties stipulated to the entry of an order reciting, "neither party shall illicit [sic] testimony from the [FAA] or the Michigan Department of Transportation Bureau of Aeronautics [DTBA]." After this order entered, the parties vigorously disagreed about the role FAA publications would play at the trial, leading to their return to this Court. See *Lenawee Co v Wagley*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2011 (Docket Nos. 302533, 302534, 302535, 302537, and 302538) (*Wagley II*).

*Wagley II* concerned the county's objection to the trial court's exclusion of four evidentiary items: an unsigned letter to United States Senator Carl Levin authored by FAA representative Christopher Blum; an affidavit ex-

ecuted by FAA manager Irene Porter addressing FAA regulations, policies, and procedures; a study conducted by Daniel P. McMillen regarding the effect of avigation easements around Chicago's O'Hare Airport; and portions of an appraisal that analyzed the effect of avigation easements at the Grand Haven Airport in Michigan. *Id.* at 8. The county further contended that the trial court should have excluded an appraisal prepared by David E. Burgoyne, the Wagleys' expert witness, setting forth an evaluation "predicated on the assumption that residential occupancy . . . was prohibited after the taking due to [the] location in the RPZ." *Id.* at 9.[4]

This Court held that the trial court had erred by denying the county's motion to exclude the portion of Burgoyne's appraisal "predicated on the assumption that FAA regulations prohibit residential use," *id.* at 10, and affirmed the other evidentiary decisions. With respect to the Burgoyne appraisal, this Court emphasized that "[i]t is entirely improper, under the law of the case doctrine, to allow the jury to hear testimony regarding an appraisal predicated on purported FAA regulations that prohibit residency in the RPZ." *Id.* at 12. We held that the parties' stipulation precluding the elicitation of testimony from the FAA or the DTBA governed the remaining evidentiary issues and affirmed the trial court's in limine rulings. *Id.* at 13.

Trial began on June 4, 2012, and ended two days later. In his opening statement, counsel for the county introduced the avigation easement concept by specifically referring to the FAA:

---

[4] This Court explained that Burgoyne had prepared three appraisals, one addressing market value before the taking, one addressing market value after the taking assuming continued occupancy, and the third addressing market value after the taking assuming that residential use was prohibited by the FAA. *Wagley II*, unpub op at 9.

> What an avigation easement is, it limits, in this case, growth of trees above a certain height that the FAA finds for safe clearance. . . .

> And as you'll hear from our witnesses here, the FAA . . . controls all aspects of flight in this country. It's amazing how many rules there are for pilots, but thank God this is a very safe industry. There's lots of rules they've got to follow.

> Now, the main purpose of the easement we took here and really the only proactive or the only thing we did was to cut down the trees that might go above these elevations. Now, the easement language here is a form document from [the Michigan Department of Transportation] and the FAA, it's a form document that's generally used in most all easements across the country.

Counsel then described the history of the airport's runway renovations and discussed the function of an RPZ concept, again making referring to the FAA.

The county presented as its first witness Stephanie Ward, manager of aviation planning for Mead & Hunt, "a consulting engineering company." The county had contracted with Mead & Hunt to develop and implement the airport expansion, and Ward worked directly on the project. Ward explained that the Wagley avigation easement was necessary to comply with FAA regulations requiring clear aircraft "approach slopes," generally defined as the places where aircraft typically fly. She likened the approach slope to a roadway: "[T]he approach slope area is where you're typically going to be driving, for example, the paved surfaces of the roadway." In contrast, the "approach surface" is more akin to the "road right-of-way," which must be "clear of signs, clear of trees, those types of things. So that way if you deviate from that area it's going to be clear of obstructions." According to Ward, the FAA generously defines the required clearance for approach slopes to

avoid obstructions "so that if a plane were to operate below the typical approach, they're not going to run into anything." Ward explained that the county acquired the avigation easement "to make sure especially with the change in the approach slope that we had the ability to control obstructions as they continued to shoot up into that approach area . . . ." She opined that the project "helped increase the safety of the Wagley property" and that the runway relocation "made it safer . . . because we were moving it farther away, giving aircraft more length to work with, and increasing the amount of safety area closer to the approach and to the properties."

During cross-examination, Ward acknowledged that the FAA recommends "whenever possible" that an airport acquire and clear all obstructions from the RPZ "if practicable." When obtaining ownership of the property is deemed "impracticable," Ward agreed that avigation easements should be obtained to control the height of structures and vegetation in a RPZ. Although the county objected to this line of questioning, the trial court permitted it to continue because it focused on Ward's opinions regarding the safety of the Wagley home given its placement within the RPZ.

Counsel for the Wagleys then confronted Ward with the following excerpt from an environmental assessment conducted in conjunction with the 1999 plan revisions:

"Problem: At this time the airport does not meet all the FAA -- all FAA and RPZ standards. Currently there are incompatible land uses in the RPZ such as homes and there are numerous penetrations of the approach surfaces such as trees and parts of buildings."

Without objection, Ward conceded that "the final environmental assessment was deeming the existence of

houses in the RPZ to be a problem that needed to be rectified[.]" Many transcript pages later, the following colloquy ensued, also without objection by the county:

> *Q.* And everybody knows what [RPZs] should be, there should be no houses in the [RPZs], that's what should happen, right?
>
> *A.* It's the FAA design criteria, so yes.
>
>    *   *   *
>
> *Q.* Do you believe that incompatible uses within the RPZ include homes?
>
> *A.* Yes.

Yet again without objection Ward conceded that the FAA "recommends that whenever possible the entire RPZ be owned by the airport and clear of all obstructions if practicable[.]"

At the conclusion of Ward's testimony, the county requested that the trial court take judicial notice that the FAA had approved the planned runway expansion. The trial court refused to do so, relying in part on this Court's opinions and the parties' previous stipulation.

The Wagleys' trial evidence focused on the contention that their home was unsafe because of its inclusion in the RPZ and therefore a total taking had occurred. Several witnesses testifying on the Wagleys' behalf described the RPZ as the area in which most aviation accidents took place and opined that homes were incompatible with an RPZ. Pilot Carl Byers, one of the Wagleys' experts, disputed the county's claim that the airport was safer because of the runway alteration:

> If all they had done was take the same size of runway designed for the same size of aircraft and move it further from the houses, then I could potentially see where that could be considered a safer condition. But that's not what

happened. They moved it 500 feet further away, but then they also made the runway larger, they designed it for larger aircraft flying for lower approach minimums, faster speeds. . . . So just moving the threshold away from the houses they negated that by making it a much bigger -- a runway attracts much larger, faster aircraft.

Byers opined that the existence of homes within the RPZ endangered residents and increased the likelihood of accidents. He represented that had his engineering consulting company been involved in this project it would have refused to "sign off" if houses remained in the RPZ. Similarly, engineer Jerald Seale expressed that when practicable, an airport should acquire all property within the RPZ. David Burgoyne, the Wagleys' principal appraiser, summarized that based on his evaluation of the available expert reports regarding the aviation issues presented in the case, "it's better if the property's acquired in fee and the houses are removed." In Burgoyne's view, the avigation easement destroyed the practical value and utility of the Wagleys' home.

The jury found that the county's "acquisition of the easement destroyed the practical value or utility of the Wagley property" and determined just compensation to be $470,000.

## II. ANALYSIS

### A. EVIDENTIARY ISSUES AND JUDICIAL NOTICE

The county raises 10 issues on appeal. The principal thrust of several arguments is that contrary to the law of the case, the trial court "repeatedly permitted [the Wagleys] to introduce testimony, that according to FAA regulations, the [c]ounty should have taken the house due to its location in the RPZ." The trial court compounded this error, the county asserts, by refusing to take judicial notice of this Court's prior ruling that the

FAA approved the avigation easement over the Wagleys'
property and by permitting testimony that placement of
the Wagleys' home within the RPZ was unsafe. The
county further complains that despite this Court's
rulings in *Wagley I* and *Wagley II*, the trial court
admitted a number of documents authored or generated
by the FAA that were attached to Ward's report.

Whether the trial court followed this Court's rulings
on remand presents a question subject to de novo
review. *Augustine v Allstate Ins Co*, 292 Mich App 408,
424; 807 NW2d 77 (2011). "Similarly, this Court reviews
de novo the determination whether the law-of-the-case
doctrine applies and to what extent it applies." *Id.*
Judicial notice is discretionary, MRE 201(c), and we
review for an abuse of that discretion a trial court's
decision whether to take judicial notice, *Freed v Salas*,
286 Mich App 300, 341; 780 NW2d 844 (2009). "An
abuse of discretion occurs when a court selects an
outcome that is not within the range of reasonable and
principled outcomes." *Carlson v Carlson*, 293 Mich App
203, 205; 809 NW2d 612 (2011).

"The law of the case doctrine holds that a ruling by
an appellate court on a particular issue binds the
appellate court and all lower tribunals with respect to
that issue." *New Props, Inc v George D Newpower, Jr,
Inc*, 282 Mich App 120, 132; 762 NW2d 178 (2009)
(quotation marks and citation omitted). "[I]f an appel-
late court has passed on a legal question and remanded
the case for further proceedings, the legal questions
thus determined by the appellate court will not be
differently determined on a subsequent appeal in the
same case where the facts remain materially the same."
*Id.* (quotation marks and citation omitted; alteration in
original). The doctrine is applicable "only to issues
actually decided, either implicitly or explicitly, in the

prior appeal." *Grievance Administrator v Lopatin*, 462
Mich 235, 260; 612 NW2d 120 (2000). "The primary
purpose of the doctrine is to maintain consistency and
avoid reconsideration of matters once decided during
the course of a single continuing lawsuit." *Ashker v
Ford Motor Co*, 245 Mich App 9, 13; 627 NW2d 1 (2001).

We begin by reviewing the holdings in *Wagley I* and
*Wagley II* that form the law of the case. In *Wagley I*, this
Court held that as a matter of law, FAA regulations did
not require fee simple ownership of all property within
an RPZ. *Wagley I*, unpub op at 5. Thus, an avigation
easement did not necessarily result in a total taking. *Id.*
at 8. In *Wagley II*, this Court considered evidentiary
issues concerning FAA requirements. First, this Court
ruled that the parties' stipulation prohibiting testimony
from the FAA or the DTBA precluded the introduction
of various written statements made by FAA employees.
*Wagley II*, unpub op at 13-14. Second, we reiterated
*Wagley I*'s ban on testimony or evidence representing
that FAA regulations prohibited residential use of prop-
erty in the RPZ. *Id.* at 10.

Thus, in its prior opinions, this Court barred (1)
evidence predicated on an assumption that FAA regu-
lations required a total taking or precluded homes in
the RPZ and (2) evidence contravening the parties'
stipulation excluding "testimony" from the FAA. This
Court's opinions did not bar all reference to the FAA or
exclude the admission or use of FAA regulations. In its
brief on appeal, the county correctly observes that

> the parties have loosely referred to FAA documents as
> "regulations." . . . In actuality, most all of the documents
> are FAA Advisory Circulars which "[p]rovide[] guidance
> such as methods, procedures, and practices acceptable to
> the [FAA] Administrator for complying with regulations
> and grant requirements. . . . They do not create or change

a regulatory requirement." FAA Order 1320.46C. [All but third alteration in original.][5]

And without question, both sides used FAA documents to suit their own purposes. During her direct examination, Ward testified that the size and shape of the RPZ were "predicated on FAA design criteria . . . ." She explained that when the county opted to build a longer runway, the FAA changed the size and shape of the RPZ. Those FAA-mandated changes, Ward continued, had to be accommodated in the airport's layout and design, and the newly created RPZ engulfed the entire Wagley property.

References to FAA recommendations continued during Ward's cross-examination:

> *Q.* The FAA recommends that whenever possible the entire RPZ be owned by the airport and clear of all obstructions if practicable?
>
> *A.* Yes.
>
> *Q.* Where ownership is impracticable, avigation easements are recommended to obtain the right to maintain the height of structures and vegetations [sic] within the RPZ footprint?
>
> *A.* Yes.
>
> *Q.* Now, you say that they recommend where it's practicable that they own the RPZ and they use avigation easements where it's impracticable, correct?
>
> *A.* Correct.
>
> *Q.* And when I deposed you, you did not --
>
> *Mr. Strauss:*[6] Your Honor, I would just place an objection on the record with that. These issues of determination

---

[5] For example, we note that the parties stipulated to the admission of exhibit M, an FAA "Advisory Circular" concerning "hazardous wildlife attractants on or near airports."

[6] Gary D. Strauss served as the county's trial counsel.

are made solely by the FAA and that determination has already been made and I don't believe it's a part of this case anymore, that determining -- that determination has been made, it's certainly their decision to make and they've made it and it's the law of the case.

*The Court*: Well, I don't think we're talking about -- they're not involved in this discussion. This is her opinion. She's your expert that said these things should be done. Didn't she?

\* \* \*

*Mr. Strauss*: Um, with all due respect, yes, Your Honor. It's not her decision to make. I think that's been her testimony throughout. It's the FAA's decision, it's their game, we go to them and say is it fine.

\* \* \*

*Mr. Strauss*: And they said yes. And that was the subject of -- of --

*The Court*: Okay. But this is a cross-examination of her and her determinations and the things that you had her testify to as to why this is reasonable and not reasonable. So I think he can ask her this in the context of it's not -- not to do with the FAA, it's her decision.

The county has not identified any testimony or evidence introduced by the Wagleys suggesting that the FAA *required* the county to obtain fee simple ownership of the Wagley property. Rather, both sides quarreled about whether the FAA recommended to airport planners that homes be moved outside the RPZ, despite that the FAA permitted their presence.

Moreover, the excerpted portions of the testimony illustrate that it would have been impractical for the parties to have tried this case in an FAA vacuum, without reference to any of the regulations, recommendations, circulars, and statements governing runways

and RPZs. Although this Court's ruling in *Wagley I*
prohibited the Wagleys from asserting a legally incor-
rect argument—that the FAA mandated a total taking
of their property—our opinion did not address evidence
regarding the practicability of removing homes or the
dangers attendant to home occupancy in an RPZ. To the
contrary, this Court specifically envisioned that
"whether the practical value or utility of the remainder
of the parcel of property is in fact destroyed is a
question to be determined by the finder of fact and
included in the verdict." *Wagley I*, unpub op at 7, citing
MCL 213.54(1).

Nor did the trial court err by denying the county's
request that it "take judicial notice that the FAA in fact
did approve the easements in this case, letting the
houses remain." That the FAA had approved the ease-
ment was squarely before the jury from the outset. On
redirect examination just before making this request,
counsel for the county established that the FAA would
not have approved the funding for the airport expansion
if it had believed that FAA requirements had been
disregarded:

> *Q.* Now, I believe some questions were asked about
> whether the county commissioners made any decisions . . .
> regarding . . . whether or not to acquire properties [in] fee,
> the whole property within the [RPZ]. Do you recall that
> question?
>
> *A.* Yes.
>
> *Q.* . . . Did the county commissioners have any input
> into that final decision?
>
> *A.* A recommendation was made. I mean they're the
> final acceptors of the grant, so they were agreed. . . .
>
> *Q.* But what is the role of the FAA with regard to that?
> Did the FAA make the decision, funding decisions as to
> whether we've complied with their requirements?

*A.* Yeah, the FAA and the [DTBA] wouldn't issue a grant if they didn't support that decision.

*Q.* And just based, of course, on your experience, which is all you can do, your professional experience, does the FAA, would they approve of this approach and the situation at the airport if they believed it was unsafe?

*A.* No, they would not of.

While the testimony of both sides' witnesses frequently blurred the distinction between an RPZ and an avigation easement, the Wagleys never challenged that the FAA had approved the project, including the easement. The evidence presented by both sides presumed that the FAA had approved the entire project, including the avigation easement.[7]

Moreover, given this Court's opinion in *Wagley II*, the trial court did not abuse its discretion by refusing to take judicial notice of the FAA's approval of the avigation easement. In *Wagley II*, we highlighted that the parties' stipulation precluded them from eliciting FAA testimony. Specifically, this Court upheld the exclusion of two documents (the Blum letter and the Porter affidavit) that apparently represented that the FAA had approved the easement. The trial court expressed that "any reference to the FAA decisions and all of that was to stay out of this case," quoting aloud the following language from *Wagley II*:

> In our view, after this Court's earlier opinion, the five cases should have come down to having a jury determine just compensation based on a diminution of value as caused by a property being encumbered by an avigation easement,

---

[7] The county also challenged the trial court's "refusal" to give a supplemental instruction to the jury on this issue when the panel submitted a question during deliberations. Yet the parties discussed the instruction with the court, and neither objected when the court chose the instruction's content.

with the jury still having the ability to determine that a
total taking effectively occurred as caused by an easement,
*but not based on FAA regulations*. [*Wagley II*, unpub op at
13 (emphasis added).]

While judicial notice of the FAA's approval of the
easement probably would not have contravened the
law of the case, in light of our opinions we cannot
fault the trial court for hewing a narrower course.
Accordingly, we reject as legally and factually un-
sound the county's argument that the trial court
permitted the Wagleys to introduce evidence contra-
vening the law of the case.

### B. WHETHER THE WAGLEYS IMPROPERLY BASED THEIR CLAIM ON PLACEMENT IN THE RPZ

In somewhat related claims, the county asserts that
the trial court incorrectly permitted the Wagleys to
structure their total-taking claim around their presence
in the RPZ rather than the diminution of value result-
ing from the avigation easement.

During the redirect examination of defense witness
Searles, the following colloquy ensued:

*Q*. Let's go back to the 1994 airport layout plan. If they
had intended for the houses to be in the RPZ ultimately in
1994 . . . , that's when they would have had to pay them for
the just compensation that we're here talking about today?

*A*. That is correct.

*Mr. Strauss*: I'm going to object. Calls for a legal conclu-
sion, Your Honor. I'd ask that that answer be stricken. As
far as the determination of just compensation from the
feds, I don't know -- it's a legal conclusion.

Following the trial court's request that defendants'
counsel repeat the question before ruling on the coun-
ty's objection, the disagreement continued:

*Mr. Bagne*:[8] The question -- the gist of the question was if the ultimate intention . . . of the 1994 airport layout plan that houses would be ultimately remaining in the RPZ, that's when they would have to pay just compensation for acquiring those rights.

*The Court*: So you mean that day or that time period?

*Mr. Bagne*: Yes.

*The Court*: I think this has been asked of other people as well, Counsel, in a different way.

*Mr. Strauss*: Um --

*The Court*: That if you put something in -- I think the question goes to the fact that if you rezone something so they can't do something but you don't bother to tell them about it, technically that's the time of the taking. I think [that is] what he's getting at, isn't it, Mr. Bagne?

*Mr. Bagne*: Well, the gist of it, Your Honor, and Miss Ward testified that they would have had to buy property rights at that time.

*The Court*: Sure. She's already said something like that.

*Mr. Strauss*: May I respond, Your Honor?

*The Court*: Sure.

*Mr. Strauss*: Okay. That -- it's just not true. It's a legal conclusion. It's not true. The federal government designates [RPZs] in the state where the airport cannot designate them.

*The Court*: I didn't say that.

*Mr. Strauss*: Ultimately -- so it would not be -- it would not be a taking. And if it was a taking, you would have to sue inverse against the federal government.

*The Court*: Your own witness testified to this. Does that make any difference to you? He's simply following up on

---

⁸ Stephon B. Bagne served as trial counsel, along with Bruce H. Benz, for the collective defendants.

that. It's already in the record, Counsel. Thank you. For whatever it's worth, I'm not sure how much if anything, but she did say that.[9]

*By Mr. Bagne*:

Q. If you -- if you're going to put -- if an airport that you're working for is going to put somebody in a RPZ, do they have to acquire property rights?

A. Yes.

Q. And when they acquire those property rights either -- that's the point in time where the property owner has a right to be -- receive whatever just compensation they're entitled to receive under whatever law that is?

A. Yes, sir.

Q. So you can't just go put somebody in a RPZ and then come back later and say we're not going to pay you for it because it was in the plans from before?

A. That is correct.

The county contends that during this exchange the trial court incorrectly "ruled" that the taking occurred when the Wagleys' property was placed in the RPZ. Without citing specific transcript excerpts, the county

---

[9] The testimony by Ward that the trial court referred to occurred during cross-examination:

Q. So you're saying that property owners that would be chucked in a RPZ wouldn't know it, nobody would tell them about it, and [they] wouldn't get paid any just compensation at that point in time --

A. Happens all the time.

Q. -- until such time as you come to obtain the appropriate property rights through the project?

A. Correct. When we find an obstruction.

Q. And when you obtain those property rights, that's when they get paid for being in the RPZ?

A. Correct.

further alleges that the trial court generally permitted the Wagleys "to present irrelevant evidence and allowed the jury to second guess the FAA and circumvent the exclusive federal process."

We have previously acknowledged that the witnesses' testimony frequently blurred the distinction between an RPZ and an avigation easement. While the easement and the RPZ are separate legal concepts, the evidence supported that the FAA required the county to obtain an avigation easement precisely because the Wagleys' property was in the RPZ. Thus, the RPZ created the need for the easement, and the easement included the land and airspace contained within the RPZ. Given the interrelationship between the avigation easement and the RPZ, the experts' use of the terms somewhat interchangeably is not surprising.

Despite the occasionally imprecise language, we find no merit to the county's claim that the trial court permitted the jury to award damages for placement of the home in the RPZ. The trial court instructed the jury that

> the county has acquired through this condemnation proceeding certain limited rights in the Wagleys' land. The rights being acquired are as follows: The right to obtain and preserve for the use and benefit of the public a right of free and unobstructed flight for aircraft landing upon, taking off from, or maneuvering about the airport;
>
> An easement and right-of-way for the benefit of the general public at large for the free, unobstructed passage of aircraft, by whomever owned or operated, in and through the air space over and across those parts of the Wagleys' lands in the air space that lays above the heights described and depicted in the -- in the tables that you saw as exhibits.

The trial court read to the jury the entire description of the avigation easement, and taken as a whole, the

instructions left no room for doubt that the jury's task was to determine whether the practical value of the remainder of the property was destroyed or diminished in value. In addition, the jury verdict form reiterated that the easement rather than the RPZ governed the jury's decision:

> **Question 1**: Do you believe that the acquisition of the easement destroyed the practical value or utility of the Wagley's [sic] property? Circle one: YES NO
>
> If the answer is "YES", how much Just Compensation must Lenawee County pay the Wagleys for the acquisition of the easement? Your verdict must be between $470,000 and $570,000. _____.
>
> If you answered Question 1 as "NO", then answer Question 2.
>
> **Question 2**: How much Just Compensation must Lenawee County pay the Wagleys for the acquisition of the easement? You may select any number between $50,535 and $540,000: _____.[10]

Because juries are presumed to understand and follow their instructions, *Bordeaux v Celotex Corp*, 203 Mich App 158, 164; 511 NW2d 899 (1993), the county cannot demonstrate that the references to the RPZ throughout the trial testimony improperly influenced the jury's deliberations or its ultimate verdict.

The county further suggests that because it lacks any responsibility for the dimensions of the RPZ (attributing that duty to the FAA alone), the Wagleys' evidentiary references to the RPZ called into question the propriety of state court jurisdiction. The county initiated this action in the state circuit court under the auspices of state law and did not, at any point in the

---

[10] The county stipulated to the instructions provided to the jury and approved the verdict form and the exhibits sent back with the jury for their deliberations.

proceedings, seek removal of the action to federal court. In accordance with the UCPA, and specifically MCL 213.55, a governmental agency is required to tender a good-faith offer to acquire private property before initiating litigation. This Court has specifically ruled "that the tendering of a good-faith offer is a necessary condition precedent to invoking the jurisdiction of the circuit court in a condemnation action." *In re Acquisition of Land for the Central Indus Park Project*, 177 Mich App 11, 17; 441 NW2d 27 (1989). This Court confirmed that the county met this necessary condition. *Wagley I*, unpub op at 3. Because the county initiated this action in the state circuit court and sought a determination of just compensation, it cannot now imply that it is not a proper party for the imposition of damages. A party is "bound by [its] pleadings," *Joy Oil Co v Fruehauf Trailer Co*, 319 Mich 277, 280; 29 NW2d 691 (1947), and it is not permissible to litigate issues or claims that were not raised in the complaint, *Belobradich v Sarnsethsiri*, 131 Mich App 241, 246; 346 NW2d 83 (1983).

### C. THE TESTIMONY OF SEARLE AND BYERS

Next, the county contends that the trial court erred by permitting defense witnesses Searle and Byers "to give their opinions of what they believe the FAA should have done," and by allowing Searle to testify "that the [c]ounty would have to pay just compensation in 1994 if the [c]ounty intended for the house to be located in the RPZ."[11]

The county correctly asserts that the trial court erred by permitting Searle and Ward to opine regarding when a taking occurs. "[T]he opinion of an expert may not

---

[11] The county never filed a motion to exclude testimony by Byers and raised no objections during his testimony, thus forfeiting this issue with regard to Byers.

extend to the creation of new legal definitions and standards and to legal conclusions." *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122; 559 NW2d 54 (1996). Additionally, "[a]n expert witness . . . may not give testimony regarding a question of law, because it is the exclusive responsibility of the trial court to find and interpret the law." *Id.* at 123. Despite the admission of this improper testimony, however, the county cannot demonstrate prejudice. Ultimately, the parties agreed to the date on which the property was to be valued. Testimony by the experts of when the taking was effectuated was completely irrelevant to this determination. Furthermore, the trial court instructed the jury, "In this case the market value of this property both before and after the taking must be determined as of July 25th, 2005, and not at any earlier or later date." Because jurors are presumed to follow their instructions, *Bordeaux*, 203 Mich App at 164, the county is unable to demonstrate that any error by the trial court in admitting Searle's testimony resulted in undue prejudice or affected the outcome of the jury's verdict.

### D. McVEIGH'S APPRAISAL

The county next asserts that the trial court erred by permitting defense expert Franklin McVeigh to testify without first conducting a hearing in accordance with *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). McVeigh testified as a Realtor regarding the effect of the airport and easement on the marketability of the Wagleys' property and the disclosures required in real estate transactions. This Court reviews for an abuse of discretion the "qualification of a witness as an expert and the admissibility of the testimony of the witness . . . ." *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007).

Similarly, this Court reviews for an abuse of discretion a trial court's decision whether to conduct a *Daubert* hearing. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes. *Carlson*, 293 Mich App at 205.

MRE 702 "requires trial judges to act as gatekeepers who must exclude unreliable expert testimony." Staff Comment to 2004 Amendment of MRE 702, citing *Daubert* and *Kumho Tire Co, Ltd v Carmichael*, 526 US 137; 119 S Ct 1167; 143 L Ed 2d 238 (1999). The purpose of a *Daubert* hearing is to filter out unreliable expert evidence. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 139; 732 NW2d 578 (2007). In *Chapin*, this Court explained:

> [S]cience is, at its heart, itself an ongoing search for truth, with new discoveries occurring daily, and with regular disagreements between even the most respected members of any given field. A *Daubert*-type hearing of this kind is *not* a judicial search for truth. The courts are unlikely to be capable of achieving a degree of scientific knowledge that scientists cannot. An evidentiary hearing under MRE 702 . . . is merely a *threshold* inquiry to ensure that the trier of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science. The courts are not in the business of resolving scientific disputes. The only proper role of a trial court at a *Daubert* hearing is to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable. The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation. [*Id.*]

"The Supreme Court has held that the principles articulated in *Daubert* . . . apply to 'all expert testimony,' although the lower courts have flexibility in the

application of the factors, because it may not make sense to apply some of the *Daubert* factors . . . ." *Thomas v City of Chattanooga*, 398 F3d 426, 431 (CA 6, 2005) (citation omitted). While *Daubert* hearings are required when dealing with expert *scientific* opinions in an effort to ensure the reliability of the foundation for the opinion, "where non-scientific expert testimony is involved, 'the *[Daubert]* factors may be pertinent,' or 'the relevant reliability concerns may focus upon personal knowledge or experience.' " *Surles v Greyhound Lines, Inc*, 474 F3d 288, 295 (CA 6, 2007) (citations omitted). "The gatekeeping inquiry is context-specific and 'must be tied to the factors of a particular case.' " *Id.*, quoting *Kumho Tire*, 526 US at 150.

McVeigh's videotaped deposition testimony was played for the jury over the county's objections asserting the need for a *Daubert* hearing. McVeigh did not offer "scientific" expert testimony; rather, his testimony constituted "other specialized knowledge." MRE 702; see *Surles*, 474 F3d at 295. "In this context, the factors enumerated in *Daubert* cannot readily be applied to measure the reliability of such testimony." *Surles*, 474 F3d at 295, citing *Kumho Tire*, 526 US at 150.

McVeigh's testimony was limited to the marketability of the property and the necessity for disclosures when attempting to sell the Wagleys' property. The Wagleys explored in detail McVeigh's employment history, education, experience, and professional associations as a realtor to provide a foundation for the opinions rendered. Through their questioning, the Wagleys established the basis for McVeigh's proffered testimony and expertise and its direct relationship to the facts of the case. Our review of the deposition transcript demonstrates that McVeigh sufficiently ex-

plained how his experience led to his opinions. The
county emphasized during cross-examination that
McVeigh's conclusions comprised opinions and were not
premised on professional literature or studies. Given
the nature of the testimony elicited and the clear
acknowledgement by McVeigh that his testimony con-
stituted opinion based on his experience, the trial court
did not err by refusing to conduct a *Daubert* hearing
before admitting McVeigh's testimony.

The county's assertion of error premised on the
Wagleys' alleged failure to comply with MCR
2.315(F)(1) is disingenuous. The county was aware that
the videotape of the deposition would be played for the
jury, stipulated that portions would be muted, and did
not object to the presentation of the deposition testi-
mony to the jury on this basis. Accordingly, the county
has failed to demonstrate the existence of plain error
affecting its substantial rights. See *Wolford v Duncan*,
279 Mich App 631, 637; 760 NW2d 253 (2008).

### E. BURGOYNE'S TESTIMONY

Next, the county contends the trial court erred by
permitting defense witness Burgoyne to testify that the
easement permitted pilots to fly three feet above the
Wagleys' roof.

An issue must have been raised before and addressed
and decided by the trial court to be deemed preserved
for appellate review. *Hines v Volkswagen of America,
Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). The
county failed to preserve this issue for review by object-
ing to this evidence. Generally, a trial court's decision
regarding the admissibility of testimony is reviewed by
this Court for an abuse of discretion. *Phillips v Deihm*,
213 Mich App 389, 401; 541 NW2d 566 (1995). This
Court reviews unpreserved evidentiary issues, however,

for "plain error affecting [a party's] substantial rights." *Wolford*, 279 Mich App at 637.

The county asserts that navigable airspace is defined by the FAA and was not contingent on the easement because the FAA permits pilots to maintain any altitude necessary for landing or takeoff. In her direct testimony, Ward initially addressed the possible height of obstructions affected by the easement. Ward noted that before the easement the Wagleys' chimney constituted "a slight penetration" in the approach area and that "[b]ecause of the change in the elevations it went from -- the allowable height shifted to exactly the -- the chimney is the controlling feature of the property." Ward acknowledged that the easement and airport authority could not "control where a pilot flies." She further testified that the "FAA has defined a point of clearance, if you will, that they want to have where there's nothing penetrating above that so that if a plane were to operate below the typical approach, they're not going to run into anything."

Similarly, another witness for the county, James Wise, testified as follows:

> *Q.* The [FAA] regulations, . . . what do they state with regards to the heights of the plane that are permissible when it's landing or taking off at an airport?
>
> *A.* Any altitude that's necessary to safely get the airplane into the air or back onto the ground.

On cross-examination, Andrew Chamberlain, the county's appraiser, opined in response to an exhibit:

> *Q.* Do you know what the height is . . . relative to the top of the Wagley's [sic] house after the taking?
>
> *A.* Within a few feet.
>
> *Q.* And how many approximately feet would that be?
>
> *A.* Less than ten.

The county cites as objectionable Burgoyne's testimony that the easement permitted aircraft to fly three feet above the Wagleys' home. Burgoyne asserted that his testimony, in part, was premised on the county's answers to interrogatories as follows:

*Q.* Now, you referenced interrogatory answers that says [sic] it's two feet when your [sic] -- above the house, when you had it three feet in your report. Is that Interrogatory 18 and 19?

*A.* Yes. Interrogatory 18 says:

"What is the lowest point of the avigation easement as it passes over defendants' residence."

Their answer is two feet.

And 19 says:

"What's the lowest point of the avigation easement when it passes over the chimney?"

And the answer is zero feet. I was worried about Santa Claus.

The county did not object to this testimony.

We find it ironic that the county now contends that testimony or evidence pertaining to the height of the easement over the Wagleys' property is irrelevant because it is the FAA that controls where pilots fly, while otherwise protesting the admission of any evidence even hinting at FAA rules. That observation aside, the county indisputably initiated the discussion of heights through its questioning of Ward and Wise. Chamberlain, the county's own expert, opined that flights could come within 10 feet of the Wagleys' roof. The respective experts offered conflicting opinions and interpretations regarding the effect of the easement. Disagreements pertaining to an expert witness's interpretation of the facts are relevant to the weight of that testimony and not its admissibility. *Surman*, 277 Mich App at 309. We find no error.

### F. INTEREST

The county challenges the trial court's award of interest on the just compensation award to the Wagleys pursuant to MCL 213.65 of the UCPA. In general, we review de novo an interest award. *Farmers Ins Exch v Titan Ins Co*, 251 Mich App 454, 460; 651 NW2d 428 (2002). We also review de novo issues of statutory interpretation. *Driver v Naini*, 490 Mich 239, 246; 802 NW2d 311 (2011).

MCL 213.65 provides for the computation of interest on a just-compensation award as follows:

> (1) The court shall award interest on the judgment amount or part of the amount from the date of the filing of the complaint to the date that payment of the amount or part of the amount is tendered. However, if a portion of the judgment is attributable to damages incurred after the date of surrender of possession, the court shall award interest on that portion of the judgment from the date the damage is incurred.

> (2) Interest shall be computed at the interest rate applicable to a federal income tax deficiency or penalty. *However, an owner remaining in possession after the date that the complaint is filed waives the interest for the period of the possession.*

> (3) If it is determined that a de facto acquisition occurred at a date earlier than the date of filing the complaint, interest awarded under this section shall be calculated from the earlier date. [Emphasis added.]

At a July 2, 2012 posttrial hearing, defense counsel sought interest on the $470,000 just compensation award, which award represented the property's value as affected by the county's possession of the easement. Counsel noted that the court had entered an order on November 21, 2007, allowing the county to take possession of the easement and therefore interest should be

computed from that date forward. The county responded that the Wagleys were only entitled to statutory interest from the date on which the county took possession of the entire property. As that had not occurred, the county asserted that the Wagleys were entitled to no interest. The trial court retorted that there was no evidence that the Wagleys "lived in the house" after the imposition of the easement. It then ordered:

> The Court will order interest from November 21st, 2007, which was the possession date. I believe the [Wagleys'] position is correct . . . that the actual interest of the property as determined by the jury, the full amount of it was from that date and the mere fact that someone may have been there one or all of these people or others -- of course, you can't live there because you can't have people congregate there. Who knows. But anyway, so that would be the date and that's an issue that the higher courts can resolve. So it will run from that date.

Although inarticulately stated, the trial court's ruling seemed to be that the imposition of the easement on November 21, 2007, amounted to a de facto taking of the entire property because the inability of people to congregate on the land rendered it uninhabitable. As noted by the trial court at the hearing, there is absolutely no record information regarding whether the Wagleys remained in residence.

The county continues to argue that the Wagleys were entitled to no interest on the just compensation award because they retained possession of the residential property, whether they used it or not, losing only the right to use the airspace beyond a certain height. While we do not agree with the trial court's reasoning in awarding interest, the county's theory also does not comport with the plain language of MCL 213.65.

"The legislative intent behind the [UCPA] is to 'place the owner of the property in as good a position as was occupied before the taking.' " *Escanaba & L S R Co v Keweenaw Land Ass'n, Ltd*, 156 Mich App 804, 815; 402 NW2d 505 (1986), quoting *Detroit v Michael's Prescriptions*, 143 Mich App 808, 811; 373 NW2d 219 (1985). "The public must not be enriched at the property owners' expense. But neither should property owners be enriched at the public's expense." *Miller Bros v Dep't of Natural Resources*, 203 Mich App 674, 685; 513 NW2d 217 (1994), citing *State Hwy Comm'r v Eilender*, 362 Mich 697, 699; 108 NW2d 755 (1961). Provisions within the UCPA provide for damages beyond a property owner's actual loss, such as the award of statutory interest, to compensate for the inconvenience experienced on the public's behalf. "In general, case law has equated condemnation awards with all other types of judgments on which interest begins to accumulate on the date of judgment. Where, however, there has been a taking of property during the pendency of the proceedings, interest is allowed from the date of taking." *In re Lansing Urban Renewal (Lansing v Wery)*, 68 Mich App 158, 166; 242 NW2d 51 (1976) (citation omitted). "[I]nterest does not begin to run until the condemnor has possession of the property . . . ." *Detroit v J Cusmano & Son, Inc*, 184 Mich App 507, 516; 459 NW2d 3 (1989).

The county relies on two cases in support of its contention that the condemning agency's "possession" of the property must amount to a complete taking. In *Dep't of Transp v Jorissen*, 146 Mich App 207; 379 NW2d 424 (1985), the plaintiff took the entirety of the defendants' land. The defendants had previously harvested fruit for a profit from trees on the property and had platted the land to sell as a subdivision. The defendants attempted to collect interest on the just compensation award from the date on which the plain-

tiff filed its complaint to take the property rather than the date on which the plaintiff actually took over possession from the defendants. *Id.* at 210-211. The defendants claimed that the "plaintiff's actions constituted a de facto taking" because the defendants "could not sell the property and received no benefits from the land" after the plaintiff filed its condemnation complaint. *Id.* at 211-212.

This Court rejected the defendant property owners' arguments, noting that a condemning agency cannot take possession of another's property until a court orders the landowner to surrender possession. *Id.* at 213. "Until that time, the owner of the property retains possession of the property." *Id.* And during the time the property owners retain possession of the land, they "waive[] their right to interest on the judgment for that period." *Id.*

The *Jorissen* Court also rejected the defendant landowners' challenge that they did not actually "remain in possession" of the property in the period after the complaint was filed but before the order transferring possession was entered. *Id.* at 214. This Court held:

> This argument confuses the right of possession with the notion of actual presence on the land. Defendants could not, by their temporary absence, deprive themselves of possession of the land. Defendants had the right to occupy and use the premises. They were in possession. . . .

> \*   \*   \*

> The term "property" includes, in addition to title and possession, "the rights of acquisition and control, the right to make any legitimate use or disposal of the thing owned, such as to pledge it for a debt, or to sell or transfer it". Until May 15, 1981, defendants were free to enter the premises and use the property.

> We conclude that defendants may have interest on the
> judgment only from May 15, 1981, when they were ordered
> to surrender possession to plaintiff. [*Id.* at 214-215 (cita-
> tions omitted).]

In *Dep't of Transp v Pichalski*, 168 Mich App 712,
715-717; 425 NW2d 145 (1988), the plaintiff eventually
took the entirety of three lots owned by three separate
defendants. In the beginning, however, the plaintiff
took only the front 60 feet of each lot abutting Ford
Road. *Id.* The plaintiff challenged the trial court's
decision to award statutory interest to the defendants
for the time "they remained in possession" of the front
portions of their lots. *Id.* at 722. This Court noted that
the defendants were not entitled to any interest in
relation to the back portions of their lots because the
plaintiff did not take possession of that portion of the
property until the conclusion of the just compensation
proceeding. This Court approved the trial court's award
of interest connected to the front portions of those lots,
but only because of the date on which the defendants
actually ceded possession to the plaintiff. *Id.* at 723-724.
The county focuses its argument here on the fact that
the Department of Transportation took actual posses-
sion of the land in *Pichalski*. Yet we find more instruc-
tive that the *Pichalski* Court approved an approach by
which the property was divided and interest was
awarded when only a portion, rather than the entirety,
of the property was taken.

The current case is more akin to *Pichalski* than
*Jorissen* in that the county did not take the entirety of
the Wagleys' property and yet the trial court awarded
interest under MCL 213.65. We affirm that decision. As
noted by the partial dissent, the county's taking
through the avigation easement did not permanently
deprive the Wagleys of the entirety of their property.
The circuit court's November 21, 2007 order did, how-

ever, immediately and permanently deprive the Wagleys "of any possession or use" of the property actually taken—the airspace above the parcel. See *Charles Murphy MD, PC v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993). In this way, this case is also similar to *State Hwy Comm v Great Lakes Express Co*, 50 Mich App 170, 172-173; 213 NW2d 239 (1973), in which the plaintiff condemned an easement across the defendant's property. No one questioned that the easement was a taking that divested the owners of possession and use of at least a portion of the property. This Court held that interest began to accumulate as of the date of the "defendant's loss of the use of its property . . . ." *Id*. at 183-184. The Wagleys' right to interest under the statute also began to run as of the date of their loss of use and right to possess the airspace above the property—November 21, 2007.

### G. HYPOTHETICAL AWARD OF 125 PERCENT OF THE PROPERTY'S VALUE IN THE EVENT OF A COMPLETE TAKING

In the trial court's judgment setting the amount of just compensation for the taking of the avigation easement, the court made the following ruling regarding additional damages:

> IT IS FURTHER ORDERED that unless an appeal is taken, pursuant to MCL 213.54(1) [the county] shall file a notice with the Court indicating whether it elects to receive title and possession of the remainder of the parcel within thirty-five (35) days of the entry of this Judgment. If an appeal occurs, [the county] shall make its election within 35 days of an order remanding the matter to the trial court. The lack of any notice shall be deemed the waiver of such an election. If [the county] elects to take title, issues relating to this election and possession of the Subject Property shall be addressed by further order of the Court. *If [the county] elects to take title, [the county] shall pay [the Wagleys] an additional $117,500 pursuant to MCL 213.23.* [Emphasis added.]

On July 25, 2005, when the county filed its complaint to condemn the Wagleys' property, MCL 213.23 provided in full:

> Any public corporation or state agency is authorized to take private property necessary for a public improvement or for the purposes of its incorporation or for public purposes within the scope of its powers for the use or benefit of the public and to institute and prosecute proceedings for that purpose. When funds have been appropriated by the legislature to a state agency or division thereof or the office of the governor or a division thereof for the purpose of acquiring lands or property for a designated public purpose, such unit to which the appropriation has been made is authorized on behalf of the people of the state of Michigan to acquire the lands or property either by purchase, condemnation or otherwise. For the purpose of condemnation the unit may proceed under the provisions of this act. [MCL 213.23, as amended by 1966 PA 351.]

On September 21, 2006, two months before the trial court granted the county's request to take the easement, the Legislature enacted 2006 PA 367 and 2006 PA 368, adding several provisions to the statute, including subsection (5), which provides:

> If private property consisting of an individual's principal residence is taken for public use, the amount of compensation made and determined for that taking *shall be not less than 125% of that property's fair market value*, in addition to any other reimbursement allowed by law. In order to be eligible for reimbursement under this subsection, *the individual's principal residential structure must be actually taken* or the amount of the individual's private property taken leaves less property contiguous to the individual's principal residential structure than the minimum lot size if the local governing unit has implemented a minimum lot size by zoning ordinance. [Emphasis added.]

This provision was effective December 23, 2006, one month after the entry of the court's order. The trial

court's award of additional funds in the event the county decided to take the entirety of the subject property was based on the mandate of subsection (5) that the condemning agency pay the residential property owner 125 percent of the property's fair market value. The question is the propriety of this award because subsection (5) was enacted *after* the complaint was filed.

Whether a statute applies retroactively presents a question of statutory construction that we consider de novo. *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 583; 624 NW2d 180 (2001). "Under Michigan law, the general rule of statutory construction is that a new or amended statute applies prospectively unless the Legislature has expressly or impliedly indicated its intention to give it retrospective effect." *Seaton v Wayne Co Prosecutor (On Second Remand)*, 233 Mich App 313, 316; 590 NW2d 598 (1998).

> In determining whether a statute should be applied retroactively or prospectively only, "[t]he primary and overriding rule is that legislative intent governs. All other rules of construction and operation are subservient to this principle." Moreover, "statutes are presumed to operate prospectively unless the contrary intent is clearly manifested." This is especially true if retroactive application of a statute would impair vested rights, create a new obligation and impose a new duty, or attach a disability with respect to past transactions. [*Frank W Lynch & Co*, 463 Mich at 583 (citations omitted).]

"However, an exception to the general rule exists where a statute is remedial or procedural in nature." *Seaton*, 233 Mich App at 317. A statute is remedial in nature when it corrects an existing oversight in the law, redresses an existing grievance, introduces regulations conducive to the public good, or intends to reform or extend existing rights. *Tobin v Providence Hosp*, 244

Mich App 626, 665; 624 NW2d 548 (2001). " 'The same
connotation [as remedial in nature] is given to those
statutes or amendments which apply to procedural
matters rather than to substantive rights.' " *Id.*, quot-
ing *Rookledge v Garwood*, 340 Mich 444, 453; 65 NW2d
785 (1954) (emphasis omitted). In *Rookledge*, 340 Mich
at 453, our Supreme Court quoted favorably the follow-
ing passage from 50 Am Jur, Statutes, § 15, pp 33-34,
which elucidates the meaning of remedial and proce-
dural statutes:

> "Legislation which has been regarded as remedial in its
> nature includes statutes which abridge superfluities of
> former laws, remedying defects therein, or mischiefs
> thereof implying an intention to reform or extend existing
> rights, and having for their purpose the promotion of
> justice and the advancement of public welfare and of
> important and beneficial public objects, such as the protec-
> tion of the health, morals, and safety of society, or of the
> public generally. Another common use of the term 'reme-
> dial statute' is to distinguish it from a statute conferring a
> substantive right, and to apply it to acts relating to the
> remedy, to rules of practice or courses of procedure, or to
> the means employed to enforce a right or redress an injury.
> It applies to a statute giving a party a remedy where he had
> none or a different one before."

"The ultimate purpose of the [UCPA] is to ensure the
guarantee of just compensation found in Const 1963,
art 10, § 2, which provides, 'Private property shall not
be taken for public use without just compensation
therefor being first made or secured in a manner
prescribed by law.' " *Dep't of Transp v Frankenlust
Lutheran Congregation*, 269 Mich App 570, 576; 711
NW2d 453 (2006). MCL 213.23(5) created a new right in
achieving this purpose—the right to an enhanced just
compensation award that did not exist before. It also
imposed a converse duty on the condemning agency to
remit an enhanced award. Although subsection (5) is

distinguishable from a statute conferring a substantive right because it relates to the remedy available under the UCPA, *Rookledge*, 340 Mich at 453, the amendment creates new obligations, which counsels against retroactive application. Irrespective of whether a statute qualifies as procedural or otherwise remedial, a court may not retroactively apply the statute if this application would abrogate or impair vested rights, create new obligations, or "attach[] new disabilities regarding transactions or considerations that have already occurred." *Grew v Knox*, 265 Mich App 333, 339; 694 NW2d 772 (2005); see also *Frank W Lynch*, 463 Mich at 585 ("[W]e have rejected the notion that a statute significantly affecting a party's rights should be applied retroactively merely because it can also be characterized in a sense as 'remedial.' ").

Further, although "the Legislature has shown on several occasions that it knows how to make clear its intention that a statute apply retroactively," *id.* at 584, the Legislature did not do so in MCL 213.23. See *Johnson v Pastoriza*, 491 Mich 417, 432; 818 NW2d 279 (2012) ("Had the Legislature intended that 2005 PA 270 apply retroactively, the Legislature could readily have provided that '[t]his amendatory act applies to a cause of action arising on or after [the date of the last prior amendment].' "). While the Legislature gave the amendatory acts adding subsection (5) immediate effect, this does not suggest an intent to make the addition retroactively applicable, *id.* at 430, particularly given the fact that the acts themselves have an internal effective date that is three months later. " '[P]roviding a specific, future effective date and omitting any reference to retroactivity supports a conclusion that a statute should be applied prospectively only.' " *Id.* at 432 (citations omitted).

The Wagleys imply that retroactive application of MCL 213.23(5) is proper because the right to the damages awarded did not vest until after the amendment was enacted despite that the complaint predated the legislative action. This argument is misguided. The potential for damages arose when the county filed this condemnation action, not when the taking was actually allowed. Moreover, the enhanced just compensation award is a damages award and not a right to costs or judgment interest that is " 'governed by the law as it exists at the time of the judgment which terminates the action . . . .' " *Ballog v Knight Newspapers, Inc*, 381 Mich 527, 534; 164 NW2d 19 (1969).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

BORRELLO, P.J., concurred with GLEICHER, J.

K. F. KELLY, J. (*concurring in part and dissenting in part*). Aside from the issue of statutory interest, I fully agree with the majority's well-written and thorough analysis of this difficult and complex case. However, I believe David and Barbara Wagley remained in possession of the property and therefore waived any statutory interest. I would, therefore, reverse that portion of the trial court's order awarding statutory interest pursuant to MCL 213.65.

"The goal of statutory interpretation is to discern and give effect to the intent of the Legislature. To that end, the first step in determining legislative intent is the language of the statute. If the statutory language is unambiguous, then the Legislature's intent is clear and judicial construction is neither necessary nor permit-

ted." *Barclae v Zarb*, 300 Mich App 455, 466-467; 834 NW2d 100 (2013) (citations omitted).

MCL 213.65 provides, in relevant part:

> (1) The court shall award interest on the judgment amount or part of the amount from the date of the filing of the complaint to the date that payment of the amount or part of the amount is tendered. . . .
>
> (2) . . . However, an owner remaining in possession after the date that the complaint is filed waives the interest for the period of the possession. [MCL 213.65(1) and (2).]

A plain reading of the statute and the particular facts of this case reveal that the trial court erred by awarding statutory interest given that the Wagleys clearly remained in possession of the property.

It is true that, pursuant to MCL 213.57(1), title to the property vested in plaintiff as of the date of the filing of the complaint for condemnation. However, although *title* automatically vested in plaintiff at the time the complaint was filed, the trial court had to take action in order for *possession* of the property to pass to plaintiff. MCL 213.59(1) provides that "the court shall fix the time and terms for surrender of possession of the property to the agency . . . ."

The difference between title and possession is highlighted by this Court's decision in *Dep't of Transp v Jorissen*, 146 Mich App 207, 213-214; 379 NW2d 424 (1985):[1]

> MCL 213.59(1) provides that after the agency has fulfilled certain requirements the trial court shall fix the time and terms for the surrender of possession of the property to the agency. [MCL 213.59(2) and (3)] govern the procedures regarding the granting of interim possession to the agency.

---

[1] The *Jorissen* Court interpreted an earlier version of MCL 213.65, as enacted by 1980 PA 87, but the earlier version was substantially similar.

The Legislature contemplated that the owner of the property would remain in possession until the trial court ordered surrender of possession or interim possession. Until that time, the owner of the property retains possession of the property. An agency may not obtain possession absent an order of surrender of possession or interim possession.

In this case, [although title vested in plaintiff on January 9, 1981, when it filed the complaint] the trial court ordered defendants to surrender possession of the property to plaintiff on or before May 15, 1981. There was no order of interim possession. Plaintiff did not obtain possession of the property until May 15. Since defendants remained in possession of the property until May 15, defendants waived their right to interest on the judgment for that period. MCL 213.65. If defendants were not "in possession", *id.*, until May 15, then the surrender of possession ordered by the court was without meaning and had no effect. [Citation omitted.]

Here, like in *Jorissen*, there was no interim order awarding possession. And although there is no record evidence that the Wagleys actually continued to occupy or use the property, such an inquiry is not dispositive of whether a party remains in possession of the property:

We reject defendants' argument that they did not remain in possession of the land because they were in Florida and received no income or use of the land after the complaint was filed. This argument confuses the right of possession with the notion of actual presence of the land. Defendants could not, by their temporary absence, deprive themselves of possession of the land. Defendants had the right to occupy and use the premises. They were in possession. That the land produced no income during the relevant period resulted from its vacant state and the change of seasons. More importantly, there is no connection between defendants' failure to obtain such income and the fact whether they were in possession or not. Surely a person may possess land which is not income-producing.

One may also be in possession of land the income from which is for some reason being received by another. In the instant case, the dispositive fact is that defendants asked for and were granted the right of possession until May 15, 1981. Since the statute allows interest to run from the date of possession, that is the date from which interest runs.

\* \* \*

The term "property" includes, in addition to title and possession, "the rights of acquisition and control, the right to make any legitimate use or disposal of the thing owned, such as to pledge it for a debt, or to sell or transfer it". Until May 15, 1981, defendants were free to enter the premises and use the property. [*Id.* at 214-215 (citations omitted).]

It is undisputed that plaintiff has possessed the rights acquired through the avigation easement since the date of the trial court's order, November 21, 2007. While evidence existed that imposition of the easement interfered with the Wagleys' use and enjoyment of the property, it did not "permanently deprive[] [them] of any possession or use of" their residence. See *Charles Murphy, MD, PC, v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993). Although the final judgment indicated that the jury had determined "that the practical value or utility of the remainder of the Subject Property has been destroyed by the taking [of the easement],"[2] this is

___

[2] MCL 213.54(1) provides:

If the acquisition of a portion of a parcel of property actually needed by an agency would destroy the practical value or utility of the remainder of that parcel, the agency shall pay just compensation for the whole parcel. The agency may elect whether to receive title and possession of the remainder of the parcel. The question as to whether the practical value or utility of the remainder of the parcel of property is in fact destroyed shall be determined by the court or jury and incorporated in its verdict.

"[T]he 'acquisition of a portion of' any given property would relate to the county's acquisition of an avigation easement interest from the property

not the equivalent of a deprivation of possession and use during the pendency of these proceedings, thus rendering unavailing defendants' assertion of entitlement to interest pursuant to MCL 213.65. Such an outcome is consistent with the intent and purpose underlying the concept of just compensation. "The purpose of just compensation is to put property owners in as good a position as they would have been had their property not been taken from them. The public must not be enriched at the property owner's expense, but neither should the property owner be enriched at the public's expense." *Dep't of Transp v VanElslander*, 460 Mich 127, 129; 594 NW2d 841 (1999) (quotation marks and citations omitted).

I would reverse the trial court's award of statutory interest.

---

owner." *Lenawee Co v Wagley*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2011 (Docket Nos. 302533, 302534, 302535, 302537, and 302538), p 4 n 2.