# STATE OF MICHIGAN

# COURT OF APPEALS

TERRY JAMES MAHRLE, as Trustee of the
TERRY JAMES MAHRLE TRUST, and TRIPLE
S PROPERTIES LLC,

              Plaintiffs-Appellants,

v

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

              Defendant-Appellee,

and

BINDER PARK ZOOLOGICAL SOCIETY INC.,
FOCUS WILDLIFE, STANTEC INC., doing
business as STANTEC CONSULTING, formerly
known as STANTEC CONSULTING SERVICES
INC., AMERICAN INTERNATIONAL GROUP
INC., LEXINGTON INTERNATIONAL GROUP
INC., and LEXINGTON INSURANCE CHARTIS

              Defendants.

UNPUBLISHED
June 15, 2017

No. 331221
Calhoun Circuit Court
LC No. 2013-000080-CK

Before: O'BRIEN, P.J., and HOEKSTRA and BOONSTRA, JJ.

PER CURIAM.

In this case relating to the lease of a commercial building, plaintiffs Triple S Properties, LLC ("Triple S") and Terry Mahrle as trustee of the Terry James Mahrle Trust ("the trust") brought claims of negligence, breach of contract, and waste against defendant Enbridge. Following a bench trial, the trial court entered a judgment of no cause of action in favor of Enbridge. Plaintiffs now appeal as of right. Because the trial court did not abuse its discretion by allowing Thomas Anthos to testify as an expert and the trial court's findings were not clearly erroneous with regard to plaintiffs' claims for waste and breach of contract, we affirm.

This case arises from Enbridge's rental of a commercial building in Marshall Township following an oil spill in July of 2010. Specifically, on July 25, 2010, Enbridge released oil into the Talmadge Creek, which feeds into the Kalamazoo River near Marshall, Michigan. Enbridge

-1-

then rented the building in question to use as an animal rescue space as part of its cleanup efforts. Enbridge signed an initial short term lease on July 27, 2010 and later a second lease for a term of 8 months on October 31, 2010. With a few minor distinctions not relevant to this appeal, the two leases contained identical provisions. When Enbridge signed the agreements, the trust owned the building; but, Triple S executed the agreements as the "landlord" for the property. Terry Mahrle is the trustee of the trust and a member of Triple S.

During Enbridge's occupancy of the building, the building was used as a place to provide veterinary services for injured animals and to clean wildlife that had been impacted by the oil spill with the intent to release the animals back into the wild. However, in the fall of 2010, the decision was made that, due to various concerns, the numerous rescued turtles could not be safely returned to the wild until the spring. Consequently, the rescued turtles were housed in the building over the winter months. The efforts to clean and care for the animals involved water— lots of water, including water contained in large tanks which were placed in an open warehouse portion of the building. All the animals were released by April of 2011. The second lease expired on June 30, 2011, and Enbridge returned the building to plaintiffs on that date.

During Enbridge's tenancy, there were undisputedly problems with moisture and mold in the building, resulting in part from increased humidity attributable to the numerous water tanks for the animals. Moreover, Enbridge brought in other various pieces of equipment, including an industrial dehumidifier; and Enbridge made changes in the building, including work to the mechanical, septic, electrical, and HVAC systems. Enbridge also removed kitchen cabinetry. At one point during Enbridge's tenancy, the building was condemned by a local building inspector, though the parties debate whether condemnation was necessary and, in any event, the problems leading to the condemnation were rectified and the condemnation designation removed.

Although there were clearly problems in the building during Enbridge's use of the property, it is also undisputed that, before vacating the property, Enbridge hired numerous experts and contractors to work on the building. Nevertheless, plaintiffs maintain that the building was not fully restored, and plaintiffs have identified a variety of allegedly ongoing defects, including mold and moisture (particularly in the attic), an inoperable curtain wall, subpar kitchen cabinetry, cracking and discoloration of walls and ceilings, damage to the parking lot, and structural damage, such as sagging ceilings, caused by moisture in the building. In view of these issues, most notably the mold problem, plaintiffs contend that the building is now worthless.

In contrast, in light of its restoration efforts, Enbridge maintains that, by the time it vacated the building in June of 2011, it had returned the building to at least its original pre-lease condition, if not better. To the extent that plaintiffs claim current problems in the building, Enbridge faults Mahrle for failing to conduct normal upkeep in the years after Enbridge vacated the property. Indeed, Enbridge asserts that some of the purported problems with the building are attributable to preexisting conditions in the building as opposed to Enbridge's use of the property. According to Enbridge, the building has been fully restored to its pre-lease condition,

and if plaintiffs are still unsatisfied it is because Mahrle was in the midst of personal financial difficulties and his real objective was to coerce Enbridge into purchasing the building.[1]

Plaintiffs filed suit against Enbridge in January of 2013, alleging: (1) breach of the first and second lease agreements, (2) negligence, (3) common law waste, and (4) statutory waste under MCL 600.2919. The case was decided with a bench trial before Calhoun Circuit Court Judge Sarah S. Lincoln. The trial was a fact intensive proceeding, involving detailed testimony from numerous experts as well as lay witnesses with respect to the condition of the building before, during, and after Enbridge's tenancy. At the close of plaintiffs' proofs, the trial court granted Enbridge's motion for involuntary dismissal relating to plaintiffs' claims for negligence. Following trial, the court issued a written decision, detailing factual findings and conclusions of law with respect to plaintiffs' claims for breach of contract and waste. The trial court then entered a judgement of no cause of action in favor of Enbridge. Plaintiffs now appeal as of right, challenging the admission of Thomas Anthos's expert testimony as well as the trial court's findings regarding plaintiffs' claims for waste and breach of contract.[2]

## I. STANDARD OF REVIEW

Following a bench trial, we review the trial court's findings of fact for clear error and the trial court's conclusions of law de novo. *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). We "give deference to the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003) (citation omitted). See also MCR 2.613(C). To the extent this case requires interpretation of the parties'

---

[1] In terms of Mahrle's financial difficulties, even though Enbridge had been paying rent and additional money for taxes, the loan on the building was in default in 2010 and the real estate taxes had not been paid in years. During Enbridge's tenancy, Mahrle repeatedly suggested that Enbridge buy the building. In 2011, the bank holding the mortgage on the property initiated foreclosure proceedings for nonpayment. Eventually, in November of 2013, the trust deeded the property to the bank via a deed in lieu of foreclosure, in exchange for which the bank forgave an outstanding indebtedness of $843,882.95 on a loan held by Triple S that had been secured by a mortgage on the property. The loan had been cross-collateralized with mortgages on other properties, and the other properties were also turned over to the bank.

[2] On appeal, plaintiffs do not challenge the trial court's dismissal of their negligence claim at trial. However, with regard to all of their claims, plaintiffs contend that that the trial court erred "by not imposing liability against Enbridge at the summary disposition stage pursuant to MCR 2.116(I)." We consider this summary disposition argument abandoned and decline to consider it because plaintiffs have given only cursory treatment of the issue, devoid of any meaningful discussion, and their argument contains almost no citation to supporting authority or the lower court record. See *Dunn v Bennett*, 303 Mich App 767, 775; 846 NW2d 75 (2013).

lease agreement, questions of contract interpretation and application are reviewed de novo. *Real Estate One v Heller*, 272 Mich App 174, 176; 724 NW2d 738 (2006).

In comparison, we review a trial court's decisions regarding the amendment of a witness list and the appropriateness of discovery sanctions, including the striking of an expert witness, for an abuse of discretion. *Dorman v Twp of Clinton*, 269 Mich App 638, 655; 714 NW2d 350 (2006); *Tisbury v Armstrong*, 194 Mich App 19, 20; 486 NW2d 51 (1991). Likewise, evidentiary decisions as well as the "qualification of a witness as an expert and the admissibility of the testimony of the witness" are reviewed for an abuse of discretion. *Lenawee Co v Wagley*, 301 Mich App 134, 161; 836 NW2d 193 (2013); *Campbell v Human Servs Dep't*, 286 Mich App 230, 245; 780 NW2d 586 (2009). "An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). Any preliminary questions of law affecting the admissibility of evidence are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law. *Barnett v Hidalgo*, 478 Mich 151, 159; 732 NW2d 472 (2007).

## II. EXPERT TESTIMONY

On appeal, plaintiffs contend that Judge Lincoln abused her discretion by allowing Thomas Anthos to testify at trial as an expert in industrial hygiene. First, emphasizing that Judge Lincoln's predecessor—Judge James Kingsley—granted a motion to strike Anthos's expert testimony, plaintiffs argue that Enbridge should not have been allowed to amend its witness list to add Anthos as an expert because Enbridge's designation of Anthos as an expert was untimely and Enbridge had been "evasive" during discovery. Second, plaintiffs assert that Anthos's opinions should not have been allowed at trial because, contrary to MRE 703, his opinions were based on inadmissible hearsay insofar as he considered reports prepared by non-testifying analysts. Third, citing MRE 702 and MCL 600.2955(1), plaintiffs maintain that Anthos lacked the necessary qualifications to testify about specific topics such as how mold grows, how mold affects humans, or how mold may affect the structure of a building. We disagree.

## A. DISCOVERY SANCTIONS/MOTION TO AMEND

"Witness lists are an element of discovery." *Stepp v Dep't of Nat Res*, 157 Mich App 774, 778; 404 NW2d 665 (1987). "The ultimate objective of pretrial discovery is to make available to all parties, in advance of trial, all relevant facts which might be admitted into evidence at trial." *Grubor Enterprises, Inc v Kortidis*, 201 Mich App 625, 628; 506 NW2d 614 (1993). "The purpose of witness lists is to avoid 'trial by surprise.'" *Id.* (citation omitted). Pursuant to MCR 2.401(I)(1), in the time directed by the trial court, the parties are required to file and serve witness lists. The witness list must include: "the name of each witness, and the witness' address, if known," MCR 2.401(I)(1)(a), and "whether the witness is an expert, and the field of expertise," MCR 2.401(I)(1)(b). If a party fails to list a witness in accordance with this rule, the trial court has the discretion to prohibit that witness from testifying at trial except upon good cause shown. MCR 2.401(I)(2). However, as a matter of policy, Michigan favors "the meritorious determination of issues," *Tisbury*, 194 Mich App at 21, and disallowing a party to call a witness is considered a "severe punishment," *Duray Dev, LLC v Perrin*, 288 Mich App 143, 164; 792 NW2d 749 (2010). In deciding whether a witness not properly named on a witness list may testify, the trial court may consider the following non-exhaustive list of factors:

(1) whether the violation was wilful or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff's engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect[;] and (8) whether a lesser sanction would better serve the interests of justice. [*Id.* at 165.]

In this case, Enbridge filed a "preliminary witness" list on October 15, 2013, and a "witness list" on January 31, 2014. Both of these initial lists identified Anthos as a witness as follows:

Thomas Anthos – TriMedia Environmental & Engineering Services, LLC, 1002 Harbor Hill Drive, Marquette, Michigan 49855.

However, missing from the witness list was the expert witness designation required by MCR 2.401(I)(1)(b). In July of 2014, Enbridge made an untimely attempt to amend its witness list to specifically identify Anthos as an "expert in industrial hygiene." Plaintiffs then filed a motion to strike Anthos's expert testimony, which was granted by Judge Kingsley.

Following Judge Kingsley's retirement, the case was reassigned to Judge Lincoln. At that time, Enbridge filed a motion to amend its witness list, which Judge Lincoln granted. Specifically, recognizing the discretionary nature of discovery sanctions, Judge Lincoln determined that the "drastic sanction" of excluding Anthos's testimony was not called for in this case. Judge Lincoln reasoned that the failure to identify Anthos as an expert was not willful, that plaintiffs had actual notice of Anthos, and that plaintiffs were not prejudiced by the amendment to Enbridge's witness list. For these reasons, Judge Lincoln allowed Enbridge to amend its witness list to include Anthos as an expert.

Given Judge Lincoln's findings, notwithstanding the untimely nature of Enbridge's amended witness list, Judge Lincoln did not abuse her discretion by allowing Anthos to testify as an expert at trial. As noted, from the outset, Enbridge identified Anthos as a witness on all of its witness lists. Enbridge's only error was in the failure to designate Anthos as an expert. However, in this regard, Enbridge did identify Anthos in connection with his company— TriMedia Environmental & Engineering Services, LLC; and, Enbridge's counsel stated in the trial court that the omission of the word "expert" in relation to Anthos was nothing more than a "typographical error." These facts support Judge Lincoln's conclusion that the omission of the expert witness designation was not willful.

Moreover, the records submitted by Enbridge in the trial court confirm Judge's Lincoln conclusion that plaintiffs had actual knowledge of Anthos and his expertise well in advance of trial. For instance, Enbridge provided the trial court with numerous emails exchanged between defense counsel and plaintiffs' counsel, beginning in December of 2013, in which Enbridge expressly described Anthos as an "expert" witness in "environmental" issues and "mold." In these emails, Enbridge repeatedly offered to make Anthos available for deposition by plaintiffs. In addition, at the request of Enbridge, Anthos attended the deposition of plaintiffs' mold

remediation expert in December of 2013, at which time plaintiffs' counsel objected to Anthos's presence. In objecting, plaintiffs' counsel stated that he had been advised that Anthos was going to be a "witness in this case as an expert for Enbridge." Given these facts, it is clear that plaintiffs had actual knowledge of Anthos and his expertise well before trial.

In terms of prejudice, the record also shows that Enbridge provided plaintiffs with materials prepared by Anthos, which set forth the nature of his opinions, including a "Technical Memorandum" and "TriMedia Data Review," which were included on Enbridge's exhibit list from January 31, 2014 and provided to plaintiffs during discovery. Ultimately, trial did not begin until May of 2015, and plaintiffs in fact deposed Anthos before trial. On this record, plaintiffs were not prejudiced, and this is certainly not a case of "trial by surprise." Thus, Judge Lincoln did not abuse her discretion by allowing Anthos to testify as an expert witness.

In arguing to the contrary, plaintiffs emphasize that Judge Kingsley granted a motion to strike Anthos's expert testimony. However, "a trial court has unrestricted discretion to review its previous decision." *Prentis Family Found v Barbara Ann Karmanos Cancer Inst*, 266 Mich App 39, 52; 698 NW2d 900 (2005). And, because the law of the case doctrine does not apply to decisions of a trial court, "a successor judge [can] correct errors made by a prior judge." *Id.* at 52-53. There was nothing to prevent Judge Lincoln from revisiting this issue and reaching a different decision from Judge Kingsley, and her decision to do so was not an abuse of discretion.

### B. MRE 703

The rules of evidence permit an expert to offer an opinion at trial. See MRE 702. However, under MRE 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference *shall be in evidence*. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence thereafter. [Emphasis added.]

"This rule permits 'an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony.'" *People v Fackelman*, 489 Mich 515, 534; 802 NW2d 552 (2011) (citation omitted).

A laboratory report prepared by a non-testifying analyst "is, without question, hearsay." *People v Payne*, 285 Mich App 181, 196; 774 NW2d 714 (2009). Typically, hearsay is not admissible. MRE 802. Consequently, laboratory reports prepared by non-testifying analysts are not admissible—and cannot be used as the basis for an expert's opinion—unless they fit within one of the exceptions set forth in MRE 803 and MRE 804. See MRE 703; *Fackelman*, 489 Mich at 534; *Payne*, 285 Mich App at 196. Relevant to this case, MRE 803(6) states:

> **(6) Records of Regularly Conducted Activity**. A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation,

all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

With regard to certification of business records for purposes of admission under MRE 803(6), MRE 902(11) allows for self-authentication of documents "if accompanied by a written declaration under oath by its custodian or other qualified person certifying" that:

> (A) The record was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
>
> (B) The record was kept in the course of the regularly conducted business activity; and
>
> (C) It was the regular practice of the business activity to make the record.

In this case, Anthos personally collected samples from the building and sent those samples to Aerobiology Laboratory Associates, Inc. Aerobiology analyzed the samples and provided Anthos with reports detailing mold counts in the samples he provided.[3] Based in part on the mold counts provided by Aerobiology, Anthos offered his expert opinions with respect to whether there was a problem with mold in the building. Notably, an analyst from Aerobiology did not testify at trial, meaning that the Aerobiology reports constitute hearsay. See *Payne*, 285 Mich App at 196. However, Enbridge sought to introduce the Aerobiology documents under MRE 803(6), accompanied by an affidavit of authenticity from Suzanne Blevins, the laboratory director at Aerobiology. Based on this affidavit, the trial court accepted the Aerobiology facts and data into evidence under the business records exception to the hearsay rule.

On appeal, plaintiffs do not address MRE 803(6) or MRE 902(11), meaning that plaintiffs have abandoned any argument regarding the admission of the Aerobiology data under these rules. *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015) ("When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant."). Given that the Aerobiology documents were admitted into evidence under MRE 803(6), the facts and data on which Anthos relied in forming his opinion were "in evidence" as required by MRE 703. It follows that the trial court did not abuse its discretion by allowing Anthos to offer expert opinions based on facts and data contained in the Aerobiology reports.

---

[3] On appeal, plaintiffs also discuss analysis conducted by Analytics Corporation at Anthos's request. However, at trial, Anthos stated that his opinion was not based on this analysis, meaning that the Analytics reports are simply irrelevant to plaintiffs' MRE 703 argument.

## C. ANTHOS'S QUALIFICATIONS

The admissibility of expert testimony is controlled by MRE 702, which states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, the trial court acts as a "gatekeeper" to ensure that expert opinion testimony is relevant and reliable. *Varran v Granneman*, 312 Mich App 591, 622; 880 NW2d 242 (2015). In addition, in an action involving injury to person or property, "a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact." MCL 600.2955(1). MCL 600.2955 provides a list of factors to be considered in determining the admissibility of expert testimony. *Barr v Farm Bureau Gen Ins Co*, 292 Mich App 456, 458; 806 NW2d 531 (2011). "In general, [g]aps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility." *Albro v Drayer*, 303 Mich App 758, 762; 846 NW2d 70 (2014) (citation and quotation marks omitted).

In this case, the trial court allowed Anthos to testify as an expert in industrial hygiene, including topics relating to the effects of mold on building structures and humans. On appeal, plaintiffs do not challenge the methodologies Anthos used in assessing the building. Rather, plaintiffs contend that Anthos lacked the necessary qualifications to offer an expert opinion. In particular, plaintiffs contend that Anthos could not offer testimony regarding "how mold grows, how mold may effect humans and how mold may effect a building or structure." According to plaintiffs, Anthos could not offer such evidence because he is not certified in construction, architecture, engineering, medicine, toxicology, or medical sciences and his opinions are merely based on information publicly available online. These arguments are without merit.

Anthos did not claim to be an expert in construction, architecture, engineering, medicine, toxicology, or medical sciences; and he expressly denied plaintiffs' assertion that his knowledge came from colloquial internet reading. Instead, Anthos offered his opinions as an expert in industrial hygiene, which he described as "the study of how environmental factors impact people in their work place or occupants in a particular building," including issues related to the health effects of particular substances as well as the working of building systems. Mold and moisture in particular are a "focus" in the industrial hygiene industry. Anthos's educational background for his profession consists of a bachelor's degree in biological science, which included classes in chemistry, toxicology, human anatomy, biostatistics, and mycology. Since graduating from college in 1993, Anthos has taken several graduate courses and at least 100 hours of continuing education per year. He also keeps abreast of recent peer reviewed scientific papers by reading the Journal of Occupational Health, which includes topics on the practice of industrial hygiene, the science of industrial hygiene, and human exposure to toxicants in the workplace.

Anthos also has three notable certifications in his field, all of which require certain education, examinations, and experience. First, since 1996 he has been certified as a hazardous materials manager, which relates to management of hazardous materials to prevent their accidental release or harm to humans or the environment. Second, in 2000, Anthos became certified as an indoor environmentalist, which relates to the "indoor environment and how that indoor environment affects occupants within the space," including the assessment of air quality, exposure to harmful substances, and the design of remediation plans. Third, most notably, in 2005, Anthos became certified as an industrial hygienist, which Anthos described as the "pinnacle certification." This area of industrial hygiene includes topics relating to building design, including matters related to vapor barriers, insulation, exterior surfacing, water shedding, ventilation, HVAC systems, and fresh air makeup. Indeed, Anthos specified that "how the building goes together and operates is integral to the industrial hygiene profession."

In addition to his education and certification, Anthos has experience in this field by virtue of his professional work for the past 22 years. He is currently the president and principal industrial hygienist at TriMedia Environmental and Engineering Services, a consulting firm that performs industrial hygiene and environmental work, primarily in a commercial setting. He is involved with hundreds of projects each year, and he has handled thousands of projects over his career. Typically, as an industrial hygienist, he is called in to assess the workplace, where there might be visually observable contaminants, such as mold on the wall or spilled chemicals, or the occupants might have health complaints, such as tiredness or itchy eyes. Basically, his job is to determine whether there is something in the environment impacting the building's occupants. Once the problem has been identified, Anthos develops a plan to remediate or mitigate the hazards. In other words, he is the person who designs the plan "for a safe building." To avoid a conflict in interest, Anthos's plan is implemented by someone other than TriMedia, after which Anthos would return and assess the effectiveness of the work that has been done. This industrial hygiene work often involves assessment of mold and moisture intrusion.

Overall, based on Anthos's education, knowledge, training and experience, the trial court did not abuse its discretion by concluding that Anthos was qualified to testify as an expert in the field of industrial hygiene, including such topics as the effects of mold on humans and buildings. See MRE 702. To the extent that Anthos was not a medical doctor or engineer, any gaps or weaknesses in Anthos's expertise were proper subjects for cross-examination, relating to the weight of his testimony, not its admissibility. See *Albro*, 303 Mich App at 762.

## III. BREACH OF CONTRACT

Next, plaintiffs contend that the trial court erred by determining that Enbridge did not breach the first and second lease agreements. According to plaintiffs, the evidence clearly showed that Enbridge failed to return the building to its pre-lease condition, failed to abide by the use provisions in the lease agreements, impermissibly changed the use of the building without necessary township approval, and failed to provide plaintiffs with a final walkthrough before vacating the property. These arguments are without merit.

The party claiming a breach of contract "must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am, NA v First Am Title Ins*

*Co*, 499 Mich 74, 100; 878 NW2d 816 (2016). A breach of contract occurs "when the promisor fails to perform under the contract." *Blazer Foods, Inc v Rest Properties, Inc*, 259 Mich App 241, 245; 673 NW2d 805 (2003). However, as a general rule, "a party to a contract cannot prevent, or render impossible, performance by the other party and still recover damages for nonperformance." *Kiff Contractors, Inc v Beeman*, 10 Mich App 207, 210; 159 NW2d 144 (1968). In addition, damages are an element of an action for breach of contract, meaning that if there are no damages, the plaintiff cannot succeed on a claim for breach of contract. *Doe v Henry Ford Health Sys*, 308 Mich App 592, 603; 865 NW2d 915 (2014); *Alan Custom Homes, Inc*, 256 Mich App at 512. "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc*, 256 Mich App at 512.

## A. BUILDING CONDITION

The most significant of plaintiffs' claims for breach of contract relate to Enbridge's obligation under the lease agreements to make repairs and to put the building back in "its pre-Lease term condition." More fully, in relevant part, the contract provisions state:

> 10. <u>Building/Parking Repairs/Maintenance</u>. Tenant shall be responsible for the exterior of the Building . . . including walls, roof, subsurface walls, and floor and including structural maintenance, repair, and replacement, and for the maintenance, repair and replacement of all mechanical systems, including the furnace and hot water heater if warranted. Tenant shall also be responsible for repair and replacement on non-structural components of the Building, including doors, windows, glass, or other fixtures (other than Tenant's furniture and trade fixtures). However, any such maintenance, repairs, or replacement for the Building or Premises that are caused by the negligence or intentional acts of Tenant shall be responsibility of Tenant to maintain, repair, or replace. Except as provided below, Landlord shall be responsible for maintenance and repairs to the driveway, sidewalks and parking lot of the Premises. . . . Landlord shall have the right to select and pay the contractor effecting all such reasonable and necessary structural repairs. Tenant agrees to put building back in its pre-Lease term condition at the end of the Lease term and building will be cleaned of all petroleum residue and [sic] any on the inside or outside any environmental issues from oil will be addressed and mitigated at the sole expense of the Tenant.

> \*\*\*

> 20. <u>Condition on Termination</u>. Tenant covenants that it will, upon the expiration or earlier termination of this Lease, (a) deliver up to Landlord, peaceably and quietly, the Premises in the same good condition they are now in or shall hereafter be placed, ordinary wear and tear . . . excepted . . . .

Based on these provisions, plaintiffs argue that Enbridge failed in its obligations to return the building in its pre-lease condition. Specifically, plaintiffs maintain that their "before" and "after" photographs amply demonstrate the damaged condition of the building following Enbridge's lease; and plaintiffs fault Enbridge for (1) failing to install a ventilation system in the attic, (2) failing to properly remediate the "significant" mold problem in the building,

particularly in the attic, and (3) failing to "gut" the building by removing the ceiling, drywall, and insulation. In making these arguments, plaintiffs highlight only the evidence favorable to their position and they fail to afford deference to the trial court's credibility determinations.

In actuality, considering the entire record and affording deference to the trial court's credibility determinations, the trial court's factual determinations were not clearly erroneous and the trial court did not err in concluding that Enbridge returned the building in its pre-lease condition. To begin with, the record demonstrates the Enbridge hired numerous experts as well as a general contractor to inspect and repair the building before returning it to plaintiffs in June of 2011. After examining the building, architect Rick Carter and engineer Kirk Grundahl confirmed that there were no structural problems relating to Enbridge's use of the building and, in particular, no signs that the moisture in the building during Enbridge's tenancy had any effect on the building's structural integrity. Support posts, added by Enbridge, were found to be structurally unnecessary and they were removed. Carter testified that the building had dried out and that there were no elevated levels of moisture in the building materials. Anthos, an industrial hygienist, assessed the mold and moisture in the building, concluding that the mold problem was a "surficial" problem that had not penetrated the building materials. Anthos developed a remediation plan. In terms of the mold, the remediation work on the building included cleaning by Servicemaster, a certified mold remediator, in accordance with Anthos's remediation plan.

In addition to this cleaning, the general contractor, Jesse Jacox, oversaw repair work on the building. Under Jacox's supervision, any holes or cracks in the walls and ceilings were patched, the walls and ceilings were also mudded, taped, and painted, new epoxy was applied to the floor in the warehouse, new carpets were installed, doors were repaired and stained, lights were replaced, wood kitchen cabinetry was installed to replace lower quality laminate cabinetry that had been removed, countertops as well appliances and sinks were replaced, the kitchen floors were cleaned, and finishing work was done to the building, such as adding jamb extensions to the doors.[4] All of Enbridge's equipment was removed from the building.

Numerous images of the building were taken by Jacox and Grundahl, and these images were admitted at trial to demonstrate the condition of the building when it was vacated by Enbridge in June of 2011. The trial court described these photographs as depicting "a clean, reasonably maintained structure." Moreover, Snider and Doherty, both of whom had personal knowledge[5] of the building's condition in July of 2010, testified that the building appeared to be in as good as, if not better, condition after Enbridge's tenancy than before. Based on the evidence presented, the trial court did not clearly err by concluding that Enbridge "addressed any and all structural or cosmetic damage caused by" Enbridge's activities.

---

[4] Enbridge did not repair the parking lot, but the lease makes clear that plaintiffs were responsible for "maintenance and repairs" to the parking lot.

[5] Oddly, plaintiffs maintain on appeal that no one associated with Enbridge had knowledge of the building's condition before Enbridge's tenancy. However, Snider—the individual who signed the first lease on Enbridge's behalf—toured the building before the lease was signed and Doherty was in the building by the end of July, close in time to the signing of the first lease.

Despite the evidence supporting the trial court's conclusion that the building was returned to its pre-lease condition, plaintiffs claim that Enbridge should have done more. First, plaintiffs claim that Enbridge should have installed an attic ventilation system consistent with plans proposed by Enbridge in January of 2011. However, as a factual matter, the trial court determined that Mahrle prevented the execution of this attic improvement, and this finding was not clearly erroneous. As testified to by Enbridge's employees and confirmed by Mahrle, Enbridge approached Mahrle about making improvements to the attic which would have necessitated cutting holes and installing permanent ventilation. Enbridge expressly asked Mahrle to provide his written approval of this plan, but Mahrle did not do so, despite repeated contacts from Enbridge. As a result, Enbridge could not proceed with the attic ventilation because the parties' lease agreement required Mahrle's written approval for "improvements" to the building.[6] By failing to provide written approval, Mahrle prevented Enbridge from executing this plan and he cannot claim that Enbridge breached the contract on this basis. See *Kiff Contractors, Inc*, 10 Mich App at 210. See also *Able Demolition v Pontiac*, 275 Mich App at 583. Moreover, the record also shows that, when Mahrle failed to sign off on the ventilation plan, Enbridge proceeded with "plan b," which involved the temporary use of an industrial dehumidifier to address the moisture in the building; and testimony from Carter and others confirmed that the building was dried out. Thus, even though Enbridge did not install a ventilation system, it cannot be said that Enbridge failed to address the moisture problem.

Second, plaintiffs claim that Enbridge should have "gutted" the entire building as originally planned by Jacox consistent with a remediation plan developed by plaintiffs' mold remediation expert, Randall Bierlien, which included the removal of drywall, ceilings, and insulation. In making this argument, plaintiffs simply ignore the fact that Anthos testified that such a plan was not necessary for the remediation of the building because the mold problem was a "surficial" issue that could be addressed by cleaning surfaces to remove the mold. Anthos's testimony was confirmed by Grundahl, who opined that there was nothing wrong with the attic insulation and no signs that the ceilings were sagging or otherwise damaged by moisture. Likewise, Carter measured the moisture in the building materials and confirmed that the building materials showed no signs of excess moisture. In short, while Bierlein proposed a more radical remediation plan than Anthos, their credibility was a question for the trial court, and the trial court did not clearly err in concluding that Enbridge's mold remediation efforts based on Anthos's plan were sufficient. See MCR 2.613(C).

Third, related to the question of mold, plaintiffs continue to assert that there is an unaddressed mold problem in the building, which was caused by Enbridge. However, in contrast to this argument, the evidence supported the trial court's determination that Enbridge addressed

---

[6] On appeal, plaintiffs contend that adding ventilation was not an "improvement" that required Mahrle's signature. But, this argument is disingenuous given that the plans called for major changes to the attic, including removing soffits as well as metal wall panels on the east gable and then cutting holes in the building to install new mechanical vents in the gables. This was not simply the repair, maintenance, or replacement of an existing feature; it was undoubtedly an "improvement" for which Mahrle's signature was required under the terms of the lease.

the mold problem in the lower level of the building. Following Enbridge's remediation efforts, Anthos again evaluated the building and determined it was safe for human occupancy. As emphasized by the trial court, even plaintiffs' mold expert, Doug Haase, acknowledged that, as of July 2011, the "occupiable space" in the building did not have a mold problem.

The only potentially close question regarding mold involves the presence of mold and moisture in the attic as of June 30, 2011. However, with respect to attic mold, Grundahl, who was accepted as an expert in mold occurrence and remediation, testified that the attic had no signs of mold at the time of his June 2011 inspection of the building. Moreover, to the extent Carter noted elevated moisture in isolated spots in the attic and Anthos observed mold in particular places in the attic in June of 2011 (but did not recommend remediation of the attic), the evidence supported the conclusion that this problem was the result of a preexisting roof condition and the poor attic ventilation. Specifically, while plaintiffs claim there were no preexisting problems, as credited by the trial court, there was ample evidence regarding improperly installed flashing and other obviously long term issues which were allowing moisture to enter the building in certain places, including the attic. The problem of moisture entering the attic was compounded by the poor ventilation, and this moisture allowed for the growth of mold. As a result, part of the reason Anthos did not recommend remediating the attic mold was because the issue could not truly be addressed without correcting the underlying, and pre-existing, moisture problem. In terms of this moisture problem, as discussed, Enbridge offered to install a ventilation system in the attic, which Carter testified would have "substantially reduced if not eliminated" the moisture in the attic, but Mahrle failed to provide the necessary written approval for this improvement. In any event, Enbridge had no contractual obligation to repair the roof or resolve a pre-existing moisture problem because Enbridge's ultimate obligation with respect to the condition of the building was to return it in its "pre-Lease condition."[7] Thus, the potential presence of mold or moisture in the attic does not demonstrate that Enbridge breached the lease.

Fourth, plaintiffs also maintain that their photographs of the building from before and after Enbridge's tenancy conclusively demonstrate the truth of their claim that Enbridge failed to return the building in its pre-lease condition. This argument is clearly flawed. Notably,

---

[7] On appeal, plaintiffs argue for the first time that, if the roof condition and moisture were preexisting, Enbridge should have repaired the roof during its occupancy because Enbridge was contractually obligated to make "repairs" under paragraph 10. As an issue raised for the first time on appeal, and an issue that has been given cursory treatment by plaintiffs, this issue need not be considered. *Dunn*, 303 Mich App at 775; *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 387; 803 NW2d 698 (2010). In any event, considering the lease as a whole, it is clear that, to the extent Enbridge was responsible for "maintenance, repair, and replacement" under paragraph 10, Enbridge's obligation was to maintain, repair and replace only insofar as it was necessary to return the building in "pre-Lease term condition." While Enbridge had the option to make "improvements" to the building under paragraph 3, it was not contractually obligated to do so. Thus, Enbridge was not required to address a preexisting roof problem or any other preexisting conditions, such as the defective curtain wall or plaintiffs' storage of a cardboard box in the basement which was associated with a finding of mold in the basement.

plaintiffs' "after" photographs date from January of 2015, more than 3½ years after Enbridge vacated the building. Given the passage of time, these photographs carry little weight in establishing the condition of the property when it was returned to plaintiffs in June of 2011. For instance, there was evidence that plaintiffs failed to maintain the building following Enbridge's tenancy; indeed, there were further water issues in the building, including a leaking pipe in 2013. It is also clear that Mahrle took no efforts to address the attic moisture, and various witnesses testified about the potential for mold growth over time when there is an unaddressed moisture problem and poor ventilation. Further, Enbridge's architect, Carter, examined plaintiffs' recent photographs; and he opined that the superficial cracking shown in the photographs was purely aesthetic and in fact expected in a building of this type, particularly when the building's temperature has not been controlled. In comparison to plaintiffs' too recent photographs, Enbridge presented numerous images taken close in time to June 30, 2011, the date when Enbridge's lease ended. It was ultimately for the trial court to examine these photographs and, in conjunction with the other evidence presented, to determine whether Enbridge returned the building in its pre-lease condition. Nothing in plaintiffs' images demonstrates that the trial court's findings were clearly erroneous.

Lastly, in regard to repairs in the building, plaintiffs take issue with the trial court's finding that Mahrle failed to avail himself of the opportunity to "select and pay" contractors as permitted under paragraph 10 of the lease. Plaintiffs emphasize that plaintiffs had the "right," but not the obligation, to "select and pay" the contractors, and plaintiffs contend this distinction somehow renders the trial court's decision clearly erroneous. In actuality, plaintiffs appear to misunderstand the purpose of the trial court's discussion on this point. That is, at trial, Mahrle testified that he wanted his own contractors to perform the work. In this context, the trial court's analysis related to whether Enbridge afforded plaintiffs the opportunity to select and pay the contractors as Enbridge was required to do by paragraph 10. The trial court noted that plaintiffs were given the opportunity to select contractors but they failed to exercise this right. In this regard, as noted by the trial court, Enbridge consulted with Mahrle about the repairs. By Mahrle's own admission, Enbridge even offered him $150,000 to pay his own contractors, but Mahrle declined the offer.[8] Having refused to exercise this right, plaintiffs cannot complain that Enbridge hired others to perform the necessary repairs. See *Nexteer Auto Corp v Mando Am Corp*, 314 Mich App 391, 395; 886 NW2d 906 (2016) (finding that a party's clear expression of an intent not to enforce a contract provision constitutes a waiver of that right).

## B. USE OF THE BUILDING

Under paragraph 4 of the leases, the parties agreed that the building would "be used for the purpose of animal rescue and cleaning, volunteer coordination and storage of donated and purchased items," and paragraph 16 specifies that Enbridge would "not use the building for any purpose other than in operation of its business to be conducted in the Premises." In addition, paragraphs 16 and 41 required Enbridge to comply with all applicable laws, including local laws

---

[8] As noted by the trial court, instead of contracting for needed repairs, Mahrle sought bids for unneeded "upgrades," including larger windows and a pizza oven.

affecting the use of the building. Plaintiffs argued at trial, and continue to argue on appeal, that Enbridge engaged in activities outside of "animal rescue and cleaning" by operating an "animal hospital" and using the building to house turtles over the winter. According to plaintiffs, the change in use had to be approved by Marshall Township. Additionally, plaintiffs complain of the unpermitted/unapproved changes Enbridge made to the building to conduct these activities, including repairs to the HVAC system, the installation of water heaters, changes to the kitchen, and the use of numerous large water tanks to house the turtles.

Contrary to plaintiffs' claims, Enbridge did not violate the "use" provisions set forth in the lease. As reasoned by the trial court, caring for animals and housing turtles that cannot be safely returned to the wild plainly constitutes "animal rescue." Thus, the trial court did not clearly err by determining Enbridge used the building as permitted by the lease. It is also clear that there was no change in use that would require the township's permission. Plaintiffs' own witness—township building inspector Frank Ballard—testified that Enbridge's use of the building would be classified as a "B" use, that the building was classified as mixed use "A/B," and that, when there is a mixed use designation, the property can be used for an "A" *or* "B" use. To the extent Enbridge did work in the building that required permits, Enbridge eventually obtained permits. And, in any event, plaintiffs have not shown damages arising from these changes or Enbridge's use of the building when, as discussed, Enbridge ultimately fulfilled its obligation to return the building to its pre-lease condition. These arguments are without merit.

## C. FINAL WALKTHROUGH

Under paragraph 14 of the lease agreements, the parties agreed that plaintiffs would conduct a "[f]inal inspection . . . prior to [Enbridge's] move out." As in the trial court, plaintiffs contend on appeal that they were not afforded a final walkthrough but simply given the keys to the premises. However, this question is purely one of witness credibility and the trial court did not clearly err when it concluded that Enbridge fulfilled its obligation to afford Mahrle a final walkthrough. In particular, while Mahrle claimed that he was not given a final walkthrough, he conceded on cross-examination that he met Jacox at the building, that Jacox actually took him into the building, and that they did a "very quick walk around" the main part of the building. In more detail, Jacox testified that he walked through the building with Mahrle, but that Mahrle was "disinterested." Given this evidence and affording deference to the trial court's credibility determinations, it seems evident that Mahrle had a final walkthrough. In any event, plaintiffs have failed to explain what damages were caused by the lack of a final walkthrough.[9] Overall,

---

[9] More generally, with respect to damages, as noted by the trial court, to the extent there may have been any minor deviations from the terms of the lease, plaintiffs have not shown damages given that the building was ultimately returned to its pre-lease condition and plaintiffs have shown no other injury. Further, in relation to the question of damages, the trial court also reasonably concluded that plaintiffs had failed to prove that the claimed damages to the building were caused by any purported breach as opposed to preexisting defects in the building or post-contract failures by plaintiffs to reasonably maintain the premises. Absent damages that are the direct, natural, and proximate result of the purported breach, plaintiffs could not succeed on their

-15-

the trial court's findings of fact were not clearly erroneous and, in view if these findings, plaintiffs' claims for breach of contract are without merit.

## IV. WASTE

Finally, plaintiffs argue that the trial court clearly erred in determining that their waste claims were not actionable. Reiterating many of their arguments relating to the breach of contract claim, plaintiffs assert that Enbridge's failure to return the building to its pre-lease condition, including most notably Enbridge's failure to remediate the attic mold, constituted waste. Additionally, plaintiffs contend that the trial court erred by concluding that Enbridge's use of the building could not constitute waste because Enbridge used the building in a manner contemplated by the lease. We disagree.

"Waste is generally considered a tort defined as the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." 8 Powell, Real Property, § 56.01, p 56-3. "The three elements of common-law waste are unreasonable conduct by the owner of a possessory estate, conduct resulting in physical damage to the real estate, and a substantial diminution in the value of the estate in which others have an interest." 93 C.J.S. Waste § 4. In Michigan, by statute, a tenant who commits waste is liable for double the amount of actual damages. MCL 600.2919(2)(a). More fully, in relevant part, the statutory waste provision states:

> (2) **Waste by holder of present estate, double damages.** (a) Any . . . tenant for years who commits or suffers any waste, during his term or estate, to the lands, tenements or hereditaments, without having a lawful license to do so, is liable for double the amount of actual damages. . . .
>
> (b) A claim under this provision may be brought by the person having the next immediate estate, in fee, for life, or for years or by any person who has the remainder or reversion in fee or for life after an intervening estate for life or for years; and each of the parties shall recover damages according to his estate in the premises. . . .

An action for waste may be maintained for damage to a building that exceeds normal wear and tear. *Anstays v Anderson*, 194 Mich 1, 4-5, 7-8; 160 NW 475 (1916). 8 Powell, Real Property, § 56.05[2], p 56-21. Waste may also exist when a party makes unauthorized improvements to a building, even if those improvements arguably add value to the property, if the improvements "materially change the nature and character of the building." *Pearson v Sullivan*, 209 Mich 306, 314; 176 NW 597 (1920). See also *Anstays*, 194 Mich at 7-8. In other words, a present possessor is expected to use the property in a reasonable manner and, as a general rule, the holder of a future interest should receive the land "substantially in the same condition" it was in when the present possessor took possession. *Anstays*, 194 Mich at 7. See also 8 Powell, Real Property, § 56.03, p 56-9. Conversely, though there is generally a duty to

---

breach of contract claim. *Doe*, 308 Mich App at 603; *Alan Custom Homes, Inc*, 256 Mich App at 512.

-16-

keep a property in "good repair," a present possessor is not required to improve the property. See 8 Powell, Real Property, § 56.05[2], pp 56-21 to 56-22. When there is a lease governing a tenancy on the property, the terms of the lease may specify the tenant's duties, 8 Powell, Real Property, § 56.05[2], p 56-22, and allow the tenant to engage in activities which might otherwise constitute waste, *Real Estate Stores v Harris*, 321 Mich 623, 628-630; 33 NW2d 97 (1948); *Stevens v Mobil Oil Corp*, 412 F Supp 809, 812 (ED Mich 1976).

Turning to the present case, plaintiffs' claims for waste fail for the same basic reasons that plaintiffs' contract claims are without merit. As an initial matter, given the terms of the lease, Enbridge's use of the building to house turtles was not unreasonable because, as discussed, the lease expressly contemplated "animal rescue and cleaning" operations in the building. See *Real Estate Stores*, 321 Mich at 628-630; *Stevens*, 412 F Supp at 812. More importantly, even if Enbridge could be considered unreasonable or careless in how it managed its operations, *Welling v Strickland*, 161 Mich 235, 243; 126 NW 471 (1910), plaintiffs' claim for waste must still fail because, as found by the trial court, Enbridge corrected "any and all structural or cosmetic damage caused by" Enbridge's activities, leaving the building structurally sound and safe for human occupancy.

Specifically, to the extent Enbridge's tenancy resulted in elevated moisture levels in the building or the occurrence of mold, as discussed *supra*, Enbridge's equipment for its operations was removed, the mold was remediated per Anthos's plan, cosmetic damage was repaired by Jacox, the building was evaluated and found to be structurally sound, and there was no ongoing moisture problem in the building attributable to Enbridge. The lease agreement permitted, indeed required, Enbridge to make these repairs to return the building to its pre-lease condition, meaning that Enbridge's repairs to the building cannot be considered waste. Cf. *Real Estate Stores*, 321 Mich at 628. Moreover, to the extent there were any potential ongoing problems in the building or issues that Enbridge did not correct, such as mold or moisture in isolated locations in the attic, the evidence demonstrated that those issues were attributable to pre-existing conditions in the building, such as a defective roof. Under the law of waste, Enbridge was not required to improve the building. See 8 Powell, Real Property, § 56.05[2], pp 56-21 to 56-22. Rather, commensurate with the lease agreement, Enbridge's obligation was to return the building to plaintiffs in its pre-lease condition. See *Anstays*, 194 Mich at 7; 8 Powell, Real Property, § 56.03, p 56-9. By virtue of the repairs to the building, Enbridge fulfilled this obligation before returning the property to plaintiffs and plaintiffs have not shown any injury to their reversionary interest. In sum, the trial court's findings were not clearly erroneous and, in view of these findings, plaintiffs' claims for waste are without merit.[10]

---

[10] Having determined that plaintiffs' claims are without merit, we need not reach plaintiffs' arguments regarding the appropriate amount of damages. We likewise decline to decide whether one or both of the plaintiffs lacked standing to pursue their claims for waste and/or breach of contract. Although Enbridge raised the issue of standing in the trial court, the trial court did not decide the standing question when ruling in Enbridge's favor. On appeal, *plaintiffs* have raised the standing question, while Enbridge concedes that the issue need not be decided. In these circumstances, we find it unnecessary to reach the question of standing.

Affirmed.  Having prevailed in full, Enbridge may tax costs pursuant to MCR 7.219.


/s/ Colleen A. O'Brien
/s/ Joel P. Hoekstra
/s/ Mark T. Boonstra