*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

STEPHEN MARK RICKETTS,

       Defendant-Appellant.

UNPUBLISHED
August 17, 2023

No. 361139
Kent Circuit Court
LC No. 19-002774-FH

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Defendant, Stephen Mark Ricketts, appeals by right his conviction of one count of second-degree child abuse, MCL 750.136b(3). The trial court sentenced defendant to 365 days in jail and three years of probation. On appeal, defendant argues that the trial court abused its discretion by denying defendant the opportunity to present expert testimony regarding defendant's intellectual diagnosis and susceptibilities. For reasons stated herein, we agree and remand for a new trial.

## I. RELEVANT FACTS AND PROCEEDINGS

This case arises out of a pediatrician discovering significant injuries to a four-month-old child at the child's doctor appointment. The child was seen by his pediatrician at the request of the parents, defendant and Alycia (Aly) Hughes, because of fussiness, spitting up, and a mass on his lower, right back. Upon evaluation, it was determined that the child suffered 28 healing rib fractures and a healing tibia fracture.

The Department of Health and Human Services, Children's Protective Services (CPS), and the Kent County Sheriff's Department began an investigation. Initially, when asked to discuss the child's injuries, both parents refused to speak about the incident without a lawyer. During the hospital stay, Aly's mother testified that defendant said that he was afraid to tell her something for fear that she would hate him; he was afraid that he caused the child's injuries, but he could not remember. Defendant then explained that he once pushed too hard on the child's legs during a diaper change. While still at the hospital for the child's treatment and upon additional questioning by CPS, neither parent was able to explain the child's injuries, but Aly mentioned how defendant bruised the child's thighs once when he changed the child's diaper. Defendant remembered

changing the child when he was squirmy and holding his upper thighs to hold him still, but he did not recall leaving any bruising. During the same conversation, defendant tearfully denied ever grabbing the child by the ribs or hurting his leg. Subsequently, a court order to remove the child from the home was granted.

The following day, both Aly and defendant agreed to meet with Aly's parents to discuss what happened to the child. Aly, defendant, Aly's parents, and two police officers who were friends with Aly's parents, met at Aly's parents' home. During the meeting, defendant explained that one time he was walking down the stairs of the duplex with the child in his arms and slipped, grabbing the child to make sure the child did not fall, and he wondered if he crushed the child's ribs when he grabbed him.

The foster-care case manager at Bethany Christian Services, Kristen Garrett, was assigned the case. Garrett initiated a treatment plan for both parents, and they both fully cooperated. At first, both parents expressed that they were unsure about what had happened. At some point, Aly expressed that she did not cause the child's injuries and that it was probably defendant. Defendant also informed Garrett that he was unsure how the child was injured but shared the same story about falling down the stairs that he shared with Aly's family. Defendant denied knowledge regarding what specifically happened to the child during his early interactions with CPS. Because of observations that defendant "was a little slow to process" things, including questions regarding his basic biographical information, CPS eventually requested a guardian ad litem for defendant to make sure that defendant understood the court process.

Both parents continued their individual treatment plans. On the basis of defendant's disclosure that he received special education services during high school and how he would bring his sister to meetings to make sure that he understood all the paperwork, defendant "was assessed with needs in the area of intellectual capacity and literacy." As a result, defendant was given an IQ assessment and was diagnosed with an intellectual disability and a very low reading level. Because of this result, Garrett increased her visits with defendant and provided additional accommodations to ensure that defendant understood everything that was expected from him.

As part of his treatment plan, defendant had continuous appointments with Dr. Daniel Ehnis and another doctor for counseling. On the basis of his psychological diagnoses and IQ assessment provided by both doctors, Garrett determined that defendant would need to live with a support person if the child were to be returned to his care. Furthermore, Garrett expressed concerns about defendant's marijuana use and how he could easily be manipulated because his drug use could affect his already diminished level of functioning. Garrett also received several allegations from defendant's family members that Aly was manipulating and controlling defendant.

Aly testified that defendant eventually told her that the child would not stop crying, he got angry, and he did not mean to hurt the child; Aly instructed defendant to tell Garrett. Shortly after, defendant scheduled a spontaneous meeting with Garrett, and defendant emotionally explained that he had caused harm to the child and that he had broken the child's ribs. According to Garrett, defendant specifically stated, "I did it Kristen," "I broke [the child's] ribs," and

> I felt them break. I remember that night [the child] was crying and I couldn't get him to stop, so I squeezed him and felt the bones break. I didn't mean to, I was

really scared to come forward at the beginning of the case because all of the doctors were saying it was on purpose and I promise it was an accident.

Five days after defendant met with Garrett, defendant left a voicemail for Garrett repeating his story regarding how the child was injured but stating that he did not actually hear the bones break. Shortly after, Garrett met with both parents to discuss the ongoing case and briefly spoke to defendant alone. Defendant did not repeat the details of what happened to the child but explained that he was mad at himself and expressed disbelief that he did it.

The criminal investigation was reopened, which limited Garrett's contact with defendant, and reunification with Aly began. Both parents remained compliant with their treatment plans, and the child was eventually returned to Aly. Aly was granted full physical custody of the child. As a result of the investigation, defendant was charged with first-degree child abuse.

An extensive trial occurred during which several witnesses were called to testify regarding the circumstances leading up to the child's injuries and the circumstances during the duration of the reunification process once the child was removed from the home. Relevant to this appeal was the exclusion of expert witness, Dr. Ehnis. Dr. Ehnis provided psychiatric treatment for defendant for two months as a result of defendant's treatment plan for reunification. Before the fifth day of trial, defendant moved for the admission of Dr. Ehnis to testify regarding defendant's diagnosis and psychological profile. Defendant explained that Dr. Ehnis was an expert in psychiatry who would be able to provide testimony about defendant's diagnosis beyond what Garrett was able to provide because of her lack of credentials. Defense counsel explained that defendant's psychological profile made him easy to manipulate and that defendant was not sophisticated enough to manipulate Aly despite Aly's testimony that defendant was manipulative towards her. Defense counsel further contended that Dr. Ehnis would explain that, because of defendant's susceptibility to manipulation, defendant could potentially make a false confession. Defense counsel reiterated that Dr. Ehnis would not provide any type of conclusion regarding whether defendant's confession was true or false, making Dr. Ehnis's expert testimony admissible.

The prosecution argued that Garrett provided the necessary information regarding defendant's diagnosis and that defendant could still make the manipulation and false-confession argument on the basis of Garrett's testimony. The prosecution explained that defendant's counseling with Dr. Ehnis was self-reported information from defendant, which would undermine the rules of evidence and allow defendant's statements to be admitted without defendant actually testifying. The prosecution requested the trial court to limit Dr. Ehnis's testimony to general information regarding defendant's diagnosis and nothing about manipulation.

Following oral arguments on the motion, the trial court confirmed that defense counsel was arguing that defendant provided a false confession as a result of coercion. The trial court questioned the validity of the coercion claim, challenging defense counsel regarding the details of how defendant confessed and the multiple confessions to various people that defendant made, including a voicemail left to Garrett after the fact. The trial court then referred to the testimony provided by Garrett regarding defendant's limitations and diagnosis. Defense counsel clarified that Garrett's testimony referred to defendant's diagnosis as "mild" and that the jury would have no idea what that categorization means. Defense counsel explained that Dr. Ehnis would explain

that individuals with defendant's particular psychological profile were easily manipulated, naïve, and confused about the consequences of their words or actions.

The trial court explained that defendant did not confess to the police or as a result of an interrogation. Instead, defendant confessed to Garrett, the person who was trying to help him get his child back. Additionally, Dr. Ehnis's psychological profile was based on what defendant told him during treatment instead of a profile based on various data sources, distinguishing the caselaw that defense counsel referred to. The trial court explained that Dr. Ehnis would not assist the trier of fact to understand the evidence or determine the fact and issue. The trial court further explained that Dr. Ehnis saw defendant for treatment purposes to determine if defendant was a safe parent for the child and could not apply his testing to the facts in the criminal case.

The trial court further reasoned that even if it found Dr. Ehnis's testimony relevant, it would confuse the issues for the jury because there was already record evidence regarding defendant's mental capacity and diagnosis. And Dr. Ehnis would not be permitted to testify that defendant was coerced or manipulated to confess. The trial court determined that the expert testimony did not comply with MRE 702 and MRE 403 and excluded the expert witness. Ultimately, the jury found defendant guilty of the lesser included offense of second-degree child abuse.

Defendant now appeals.

## II. ANALYSIS

Defendant argues that the trial court abused its discretion by denying defendant's request for Dr. Ehnis to present expert testimony at trial. We agree.

This Court reviews the qualification of a witness as an expert and the admissibility of the expert's testimony for an abuse of discretion. *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). An abuse of discretion occurs when the trial court's "decision falls outside the range of principled outcomes." *Id*. (cleaned up). A trial court "necessarily abuses its discretion when it makes an error of law." *People v Gerhard*, 337 Mich App 680, 685; 976 NW2d 907 (2021) (cleaned up). Questions of statutory interpretation or constitutional law are reviewed de novo. *People v Miller*, 498 Mich 13, 16-17; 869 NW2d 204 (2015).

A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable. *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). MRE 702 establishes prerequisites for the admission of expert witness testimony. The rule provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702.]

The party proffering the expert bears the burden of persuading the trial court that the expert has specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue, *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986), and that the opinion is based on a recognized field and methodology, *Craig v Oakwood Hosp*, 471 Mich 67, 80, 83; 684 NW2d 296 (2004). The preliminary determination of the qualification of an expert is an issue for the court to decide. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). Generally, when determining whether a witness is qualified as an expert, the trial court should not weigh the proffered witness's credibility. *Surman v Surman*, 277 Mich App 287, 309; 745 NW2d 802 (2007). Rather, a court's doubts as to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, are issues regarding the weight to be given the testimony, and not its admissibility. *Lenawee Co v Wagley*, 301 Mich App 134, 166; 836 NW2d 193 (2013). The extent of a witness's expertise is usually for the jury to decide. *People v Whitfield*, 425 Mich 116, 123-124; 388 NW2d 206 (1986).

The critical inquiry is whether the expert testimony will aid the fact-finder in making the ultimate decision in the case. *Smith*, 425 Mich at 105. In determining whether the testimony would aid the trier of fact, it is helpful to apply the common-sense inquiry whether an untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from experts. *Id*. at 106. The facts of a particular case on which an expert bases his or her testimony must be in evidence. MRE 703. Expert testimony may be excluded when it is based on assumptions that do not comport with the established facts. *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007).

Our Supreme Court has determined that a defendant may not present evidence of diminished mental capacity to negate specific intent and that a trial court could properly exclude evidence of defendant's mental limitations offered for that purpose. *People v Carpenter*, 464 Mich 223, 236; 627 NW2d 276 (2001). However, just because the rules of evidence preclude the use of evidence for one purpose, does not render it inadmissible for other purposes. "Rather, the evidence is admissible for a proper purpose, subject to a limiting instruction under MRE 105." *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). Therefore, a defendant could present evidence of limited intellectual capabilities if offered for a relevant purpose other than to negate the specific intent element of the charged crime. *People v Yost*, 278 Mich App 341, 355; 749 NW2d 753 (2008). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. There are circumstances in which a defendant's mental capacity may make a fact that is of consequence to the determination of the action more or less probable. *Yost*, 278 Mich App at 355-356.

This Court, in *Yost*, held that the trial court abused its discretion by precluding expert testimony about the defendant's limited intellectual functioning and how that functioning might have affected the defendant's communication skills and behavior. This Court determined that a defendant's reactions and statements could not be fully evaluated by the jury without understanding the defendant's intellectual limitations. *Id*. at 365-366. The facts in this case overlap considerably with the facts in *Yost*.

In *Yost*, the defendant was charged with the murder of his daughter. The defendant had limited intellectual capabilities and was functioning at a second-grade level, *id*. at 350, similar to

defendant in this case. The defense counsel sought to elicit testimony from the defendant's psychologist regarding the defendant's intellectual functioning; cognitive processing; judgment; and problem-solving abilities including the defendant's susceptibility to manipulation into making statements that made the defendant seem guilty. *Id.* One of the key questions at trial was whether the defendant's child died on her own, whether deliberately or accidentally, or if the defendant caused her death. The circumstances, timing, and context surrounding the defendant's statements and actions were highly relevant, and the prosecution relied heavily on testimony regarding the defendant's statements and actions from both before and after the daughter's death to suggest that the defendant had a guilty conscience. *Id.* at 357. Defense counsel wanted to show that the defendant's statements and actions were not evidence of guilt when understood in light of the defendant's limited education and intellectual capabilities and that a person of defendant's intellect could easily be manipulated into making statements that might appear to reflect a guilty conscience. *Id.* Defense counsel explained that the evidence would "explain why [the defendant] said what she did, or the way she said it, or how she said it, and put[] it into context why some people either misunderstood statements or why someone [who] was functioning at a second[-]grade level would act in a certain way or talk in a certain way." *Id.* at 350.

This Court determined that the defendant was entitled to a new trial because the trial court abused its discretion when it prevented the defendant's psychologist from testifying. *Id.* at 365. This Court explained that, although the expert relied on defendant's statements during testing, it did not necessarily mean that defendant had to offer the statements to prove the truth of the matter asserted and that the expert could "very well have been able to evaluate defendant's intellectual functioning on the basis of defendant's answers regardless of the veracity of those answers." *Id.* at 363. This Court recognized that statements made to a mental-health professional by a patient are often valuable for evaluation without regard to their truth. *Id.* at 363-364, citing *People v Beckley*, 434 Mich 691, 728; 456 NW2d 391 (1990). Therefore, the fact that the tests reflected the defendant's responses did not necessarily require a conclusion that the tests and responses were inadmissible hearsay. *Yost*, 278 Mich App at 364.

This Court explained that the expert's opinion was based on records that were likely admissible under a hearsay exception because the expert evaluated records that pertained to the prior and current treatment of the defendant and would likely be considered records of regularly conducted activity. *Id.* at 365; see MRE 803(6). Additionally, the statements within the records were likely admissible as statements made for the purpose of medical treatment or diagnosis in connection with treatment. *Yost*, 278 Mich App at 365, citing MRE 803(4).

Similar to *Yost*, defense counsel sought expert testimony from Dr. Ehnis to provide context to the jury regarding defendant's statements to various individuals throughout the case. Defendant was diagnosed and treated by two medical professionals, including Dr. Ehnis, and the diagnosis and treatment were relied upon by the CPS case manager. Evidence of defendant's intellectual limitations was only briefly introduced as evidence during the trial because the case manager did not have the credentials to explain defendant's diagnosis thoroughly. Additionally, the prosecution introduced evidence during trial regarding the statements made by defendant to various individuals, including Aly, Aly's parents, the police, and Garrett, regarding the details of the incident that may have contributed to the injuries that the child sustained. Defendant's statements significantly ranged in consistency. It is clear that defendant's statements were an extremely important aspect of this case and the jury should have been informed regarding all aspects of

defendant's behavior and statements, including his intellectual limitations, so that it could make a knowledgeable determination of the facts presented.

Dr. Ehnis was one of defendant's treatment providers and should have been permitted to provide testimony under MRE 803(4). Regardless of whether MRE 803(4) applies, Dr. Ehnis was prepared to testify regarding defendant's diagnosis and how his diagnosis impacted his behavior and susceptibility to manipulation, similar to the expert in *Yost*. Therefore, his testimony would likely qualify under other hearsay exceptions and should have been permitted. And the trial court could have provided an additional jury instruction to limit any prejudice as this Court recommended in *Yost*.

Reversed and remanded. We do not retain jurisdiction.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Sima G. Patel